361 A.2d 263

Marion Woodward PAYNE et al., Appellants,

v.

Jacob G. KASSAB, Individually and as Secretary of the Pennsylvania Department of Transportation, et al., Appellees.

Appeal of Frances Phelps WALLER et al.

Supreme Court of Pennsylvania.

Argued June 30, 1975.

Decided July 6, 1976.

228

James F. Geddes, Jr., Wilkes-Barre, for appellants.

Gregory S. Ghen, Penn DOT-Legal, Harrisburg, for appellee, Jacob G. Kassab, Etc.

Chester B. Muroski, Asst. City Sol., Wilkes-Barre, for appellee, City of Wilkes-Barre.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

By means of a complaint in equity filed in the Commonwealth Court,[1] several residents of the City of Wilkes-Barre and a group of students from Wilkes College in Wilkes-Barre have sought to halt a street-widening project proposed by the Pennsylvania Department of Transportation (Penn DOT) for River Street in Wilkes-Barre. After a trial before Judge Mencer sitting as chancellor an adjudication, including a decree nisi, was filed dismissing the complaint. *Payne v. Kassab*, 11 Pa. Cmwlth. 14, 312 A.2d 86 (1973). Plaintiffs' exceptions thereto were dismissed and the decree nisi was made final by the entire court sitting en banc. *Payne v. Kassab*, 14 Pa.Cmwlth. 491, 323 A.2d 407 (1974). This appeal followed.[2]

Appellants protest the River Street project because of the allegedly negative impact it will have on the historical, scenic, recreational and environmental values of an area of Wilkes-Barre known as the River Common. The River Common is a tract of approximately thirty-two acres which is bounded on the north and south by North and South Streets respectively, on the west by the Susquehanna River and which has as its eastern boundary the easterly curb of River Street. Approximately eleven acres of the Common area consist of the Luzerne County courthouse, railroad tracks and various streets.

---

1. Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, Art. IV, § 401, 17 P.S. § 211.401 (Supp.1975–1976).

2. Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, Art. II, 203, 17 P.S. § 211.203 (Supp.1975–1976).

The remaining twenty-one acres are a tree-lined park area utilized for many and varied recreational and leisure activities. Also contained within the boundaries of the Common are several historical markers and monuments.

As mentioned, River Street, part of the Common since the Common's inception,[3] forms the entire eastern boundary of the Common. River Street and the bordering areas are described by the chancellor in uncontested[4] findings of fact as follows:

"17. River Street is a multilane roadway which passes through the River Common along its eastern side as well as beyond the limits of the park in both a northerly and southerly direction. It varies from three to four lanes along the length of the Common. At South Street, River Street is forty-six feet six inches wide, tapering to forty-two feet in width five hundred feet north of South Street. It is at this point that the proposed project will commence. The existing street continues to gradually narrow down to thirty-two feet at Market Street. North of Market, River Street is thirty feet wide until it gradually widens to thirty-eight feet six inches at North Street. This allows for four lanes of traffic between South Street and Northampton Street and three lanes of traffic for the remainder of the distance.

"18. River Street is bordered by tree-lined sidewalks on both sides, and a tree lawn is between these sidewalks and River Street. The trees in both of these tree lawns are in variable conditions. . . .

                *      *      *      *      *      *      *

"20. On the west side of River Street, the side of the River Common, the following significant struc-

3. See the chancellor's Findings of Fact Nos. 6–14 quoted *infra* at pp. 267, 268.

4. Appellants excepted to Finding of Fact No. 21 but only on the basis that the gasoline station referred to no longer exists and that mention of an American Legion Post and Jewish Community Center was not made.

tures and features may be found: On the corner of North Street and River Street is the front of the Luzerne County Courthouse, with a cement sidewalk and steps leading to the Courthouse. The cement sidewalk continues in a southerly direction to the tracks of the Wyoming Valley Railroad Company. An earthen driveway to the rear of the Courthouse is immediately adjacent to the tracks. Three large trees and the ends of several paths leading into the Common lie just south of the tracks. The sidewalk becomes a cinder walkway for the rest of the length of the project. A low stone walk divides the area of the cinder walk from the rest of the Common for most of the remaining length of the project. At Market Street, the stone wall terminates and the cinder walk broadens and merges with the sidewalk of the Market Street bridge. Granite railing borders the sidewalk area in the vicinity of this intersection. These facilities are paralleled on the south side of the bridge, where the stone wall begins again. A one-story building with flood protection equipment lies just sought of the bridge. The stone wall terminates just south of Northampton Street and there is no divider for the remainder of the Common.

"21. On the [east] side of River Street, there is a concrete sidewalk throughout. North Street, Jackson Street, the railroad tracks, West Union Street, Market Street, Northampton Street, and South Street intersect with River Street. Between North Street and Jackson Street, Luzerne County maintains a parking lot. Kings College lies south of Jackson Street. Various properties, with well established front lawns continue to a point just north of Market Street. At that point, there is a medium-sized hotel (the Hotel Sterling). A gasoline station is on the south side of the intersection. For the remaining length of the project, most of the buildings are residential type structures, many owned

by Wilkes College. A Baptist Church lies just south of the Market Street intersection."

As early as 1968, Penn DOT began studying proposals for the improvement of River Street,[5] which is considered by transportation planners to be an essential link in the regional transportation system of Wilkes-Barre and Luzerne County.[6] Although various plans were considered, only two proposals survived this initial study phase. Those two plans for the straightening and realigning of River Street were presented at a public hearing in Wilkes-Barre on April 20, 1971. The plans differed in that Scheme I involved taking property from both the west or River Common side and the east side of River Street while Scheme II entailed taking of property only from the eastern side of the street. Penn DOT recommended Scheme I because acquisition costs were significantly lower; considerably less local property tax revenue would be lost; successful reconstruction of the disrupted area to its original form seemed more likely; and fewer irremediable negative environmental effects were anticipated.

Appellants, among others, registered their opposition at the April 20th meeting and argued for either no work at all on River Street, or, in the alternative, for Scheme II, which would not impinge directly upon the River Common. After consultation with various state and local agencies,[7] local officials,[8] and local interest groups [9]

5. The need for improvement of River Street was brought to Penn DOT's (then the Department of Highways) attention by a resolution of the Wilkes-Barre City Council, dated April 7, 1964, which requested a survey and recommendation from Penn DOT with respect to the widening of River Street.

6. This view was expressed in the Lackawanna-Luzerne Transportation Study conducted by various federal, state and local officials and a copy of which appears in the record of this case. See the chancellor's Finding of Facts Nos. 22–24.

7. Luzerne County Planning Commission, the Lackawanna-Luzerne Transportation Study group, the Wilkes-Barre Redevelopment Authority, the County of Luzerne.

and further study and modification of Scheme I, Penn DOT announced the adoption of that scheme on November 5, 1971. On November 12, 1971 pusuant to the requirements of the Act of May 6, 1970, P.L. 356, No. 120, § 13(b) as amended, 71 P.S. § 512(b) (Supp.1975–1976) [Act 120], the Secretary of Penn DOT filed his findings that the approved River Street project would have some adverse effect on the River Common but that no feasible alternative for the needed work existed and all reasonable steps to minimize the adverse effect had been taken.[10]

The plan envisions the widening and realigning of River Street to a uniform four lane road having a minimum width of forty-two feet and improvement of River Street's intersection with North and South Streets. Land from both sides of River Street will be taken with incursions of up to twelve feet, varying according to the need at various points. The total amount of land from the Common to be diverted to this use is .59 acres. Presently located in the path of the proposed fourth lane are sections of tree lawns and sidewalks. (See the chancellor's Findings of Fact Nos. 18, 20 and 21 quoted above). The plan calls for replacement of these areas once construction of the new lane is finished. The disrupted area will be recurbed and restructured. The tree lawn is to be reconstituted with twenty-eight trees replacing the twenty-three which will be removed. The whole area will be relandscaped and the stone wall bordering the sidewalk on the Common side will be reconstructed with its original materials; recent flood damage to the wall will also be repaired. Two historical markers, the his-

---

8. City of Wilkes-Barre: the Planning Commission, the Recreation Department, the City Engineer, the City Planner and the City Council.

9. Including the Greater Wilkes-Barre Chamber of Commerce and the Wyoming Valley Motor Club.

10. Both the approval of the plans and the secretary's findings appeared, as required by Act 120, in the Pennsylvania Bulletin. (Vol. 1, No. 73 at 2086; Vol. 1, No. 74 at 2109).

234

torical significance of which is unrelated to any exact location, will be moved to other points in the Common area. In addition, provision has been made that the entrance steps to the Luzerne County Courthouse at the north end of the Common will be undisturbed, with the ncessary widening at that point to be accomplished entirely on the eastern side of River Street.

At the outset, we note that our scope of review is narrowly drawn. Ordinarily, the findings of a chancellor, affirmed by the court en banc, have the effect of a jury verdict and will not be reversed unless a review of the record reveals that they are unsupported by the evidence or predicated upon erroneous inferences and deductions or errors of law. *Cohen v. Sabin,* 452 Pa. 447, 307 A.2d 845 (1973); *Dozor Agency, Inc. v. Rosenberg,* 431 Pa. 321, 246 A.2d 330 (1968); *Onorato v. Wissahickon Park, Inc.,* 430 Pa. 416, 244 A.2d 22 (1968); *Schwartz v. Urban Redevelopment Authority of Pittsburgh,* 416 Pa. 503, 206 A.2d 789 (1965). The chancellor has seen and heard the witnesses; if a reading of the record reasonably can be said to yield the conclusions which he has drawn, we may not substitute our judgment for his. *Harrisburg School District v. Pennsylvania Interscholastic Athletic Association,* 453 Pa. 495, 309 A.2d 353 (1973); *Yuhas v. Schmidt,* 434 Pa. 447, 258 A. 2d 616 (1969). See 9 Standard Pennsylvania Practice, Ch. 40, §§ 113, 115–117 (1962).

I.

In support of their exceptions to the chancellor's findings of fact and conclusions of law, appellants present three main arguments. They first contend that the proposed widening of River Street is impermissible because it violates the language of the statutory dedications of the land in question as a public Common. A brief review of the history of the River Common is nec-

essary as background for the resolution of this conten-
tion.   That history is fully set forth in the following un-
contested findings of fact of the chancellor:

"6.   Dating from about the year 1770, when the
original town of Wilkes-Barre was plotted out by set-
tlers of the Susquehanna Company from Connecticut
Colony, there has existed a tract of land bordering the
Susquehanna River at Wilkes-Barre, consisting origi-
nally of approximately thirty-five acres and dedicated
and used as a public common.

"7.   In 1799, while Wilkes-Barre was still a town-
ship, the Legislature of the Commonwealth of Pennsyl-
vania, in order to resolve conflicting claims between
Pennsylvania and Connecticut settlers and to legalize
titles to lands in the area involved, which included the
then township of Wilkes-Barre, passed an act entitled
'An Act for offering compensation to the Pennsylvania
claimants of certain lands within the Seventeen Town-
ships in the county of Luzerne, and for other purposes
therein mentioned.'   Act of April 4, 1799, recorded in
Law Book Vol. VI, 394, 3 Sm.L. 362.

"8.   On January 2, 1804, commissioners appointed
under the Compensation Act of April 4, 1799, and its
supplements, made and returned a survey and issued a
certificate to the 'township committee,' at that time
comprised of Matthias Hollenback, Lord Butler, and
Jesse Fell, for two tracts of land in the township of
Wilkes-Barre, 'one thereof being a square in the town
plot thereof and called the Centre Square and the other
being the public common on the river bank,' and the
latter embracing the entire river front from North
Street to South Street;   which two tracts contained
about 'thirty-nine acres and forty-one perches, with
the usual allowance of six percentum for roads.'

"9.   By the Act of March 17, 1806, recorded in Law
Book Vol. X, 326, 4 Sm.L. 321, the Borough of Wilkes-

Barre was incorporated by the Legislature of the Commonwealth.

"10. By Section III, Act of April 9, 1807, recorded in Law Book Vol. XI, 47, 4 Sm.L. 411 (a supplement to the Act of April 4, 1799), the Pennsylvania Legislature dedicated that portion of the River Common along the river front between South and Union Streets for use as a public common in the following manner: 'And be it further enacted by the authority aforesaid, That all that certain tract of land fronting the town-lots in the borough of Wilkes-Barre, on the bank of the Susquehanna, extending from the land of Jebez Fish, up the said river, one hundred and ninety-two rods, in a line parallel with the front line of the town-lots, be, and the same hereby is granted and set apart as a public common, and to remain as such for ever.'

"11. By the Act of March 28, 1846, P.L. 196, § 6, the Pennsylvania Legislature provided: 'That all that certain tract of land, fronting the town lots in the borough of Wilkes-Barre, on the bank of the Susquehanna River, extending from the north side of Union street, up the said river, about sixty three rods to the north side of North street, be and the same hereby is granted and set apart as a public common, and to be under the control and jurisdiction of the town council of said borough.'

"12. By Articles of Agreement made February 8, 1869, and recorded in Luzerne County Deed Book 141 at page 276, and by Indenture made May 16, 1870, and recorded in Luzerne County Deed Book 141 at page 278, the Trustees of the Properties of the Borough and Township of Wilkes-Barre, successors to the former Township Committee, did convey the two tracts of land, being the Public Square and the River Common, to the Burgess and Town Council of the Borough of Wilkes-Barre.

"13. By patent issued from the Land Department of the Commonwealth of Pennsylvania on January 10, 1870, and recorded in Luzerne County Deed Book 170 at page 240, and upon the payment of the sum of $207.39, the two tracts of land, namely the Public Square and Public Common (River Common), were granted to the Burgess and Town Council of the Borough of Wilkes-Barre.

"14. The Borough of Wilkes-Barre became an incorporated city of the Commonwealth of Pennsylvania pursuant to the Act of May 4, 1871, P.L. 539."

Appellants correctly assert that public officials entrusted with the management of land dedicated to the public must not approve uses of the land which transgress the terms or limitations of the original grant. Such action would amount, in effect, to an impermissible revocation of the dedication. See e. g., *Commonwealth v. Connellsville Borough*, 201 Pa. 154, 50 A. 825 (1902). Cf. *Bruker v. Carlisle Borough*, 376 Pa. 330, 102 A.2d 418 (1954). The land so dedicated, therefore, may be diverted by the responsible public officials neither to private uses, see, e. g., *Bernstein v. Pittsburgh*, 366 Pa. 200, 77 A.2d 452 (1951); *Hoffman v. Pittsburgh*, 365 Pa. 386, 75 A.2d 649 (1950); *Trustees of the Philadelphia Museum v. Trustees of the University of Pennsylvania*, 251 Pa. 115, 96 A. 123 (1915); *Morrow v. Highland Grove Traction Co.*, 219 Pa. 619, 69 A. 41 (1908); *Gumpert v. Hay*, 202 Pa. 340, 51 A. 968 (1902); *City of Pittsburgh v. Epping-Carpenter Co.*, 194 Pa. 318, 45 A. 129 (1900), nor to public uses not within those designated or specified in the dedicatory language. See cf., *Bruker v. Carlisle Borough*, supra.

Here, Penn DOT and the City of Wilkes-Barre, the governmental body charged with responsibility for the Common, propose no diversion to private use of the .59 acres of the Common required for the project. Clear-

ly, the planned improvement of River Street are intended for the public benefit and constitute a public use of the land. Appellant's reliance on cases, such as those cited above, which hold that diversion of public land to private use is prohibited, is therefore misplaced. The only question is whether the proposed new public use is proscribed by the dedicatory language.

Restrictions on use contained in statutory grants are to be strictly construed. *Bernstein v. Pittsburgh*, supra, 366 Pa. at 205–206, 77 A.2d at 454–455. It is equally well established, nevertheless, that diversion of dedicated land from one public use to another may be approved in a proper case. For example, in *Shields v. Philadelphia*, 405 Pa. 600, 176 A.2d 697 (1962), the use, as a Little League baseball field, of a portion of park land dedicated to the City of Philadelphia as a park "on condition that no buildings shall be erected thereon other than those required for the comfort of the people, and also that the garden and trees shall be preserved as far as possible" was held not to violate the language of the dedication. We said in *Shields* that parks were commonly recognized as places particularly well-suited to recreational and athletic endeavors of every sort and that, because much of this park would remain untouched, the proposed use was not inconsistent with the terms of the original grant. Likewise, in *Bernstein v. Pittsburgh*, supra, use for an open-air auditorium of portions of land dedicated to the public as a park was held not to violate the dedicatory language which called for a "place of free, attractive and healthful resort, and open air recreation . . . and perpetually keeping and maintaining the same for such uses . . . and for no other purpose whatever." We concluded that the mental and cultural recreational activities planned for the auditorium (light opera productions) were consonant with the dedicatory proscription. See also *Bruker v. Carlisle Borough*, supra; *Commonwealth v. Connellsville Borough*, supra.

An examination of the dedicatory language in the instant case produces no indication of an intention on the part of the draftsmen to preclude improvement of a street which has been a public thoroughfare through the Common from the beginning. The proposed plan will divert less than three per cent [11] of the Common from one public purpose to another public purpose, i. e., from use as part of the street-bordering tree lawns and sidewalks to use as part of a widened and improved street. Moreover, there is ample testimony to support the chancellor's conclusion that once the construction work is completed, the tree lawns and sidewalks will be reconstructed and the essential character of the Common will remain unaltered. As indicated earlier, the plan includes numerous proposals for preserving, and improving where possible, the present attractive features of the affected area. Thus, we find that the chancellor's conclusion that the proposed use does not violate the statutory dedications is sound and well-supported by the evidence.

## II.

Appellants next argue that Penn DOT by its approval of the widening project abused its discretion and violated the obligations imposed on it by Section 13 of the Act of May 6, 1970, P.L. 356, No. 120, as amended, 71 P.S. § 512 (Supp.1975–1976) [Act 120]. As to road construction projects which involve an historical site or a public park area like the Common, Act 120 requires Penn DOT, before giving final approval, to determine that no feasible and prudent alternative exists and that the project under consideration is planned in such a way as to minimize the harm to the affected land.[12] In furtherance of this objective of environmental protection, Act 120 also

11. Penn DOT in its brief, calculates that the .59 acres of Common land needed equals 2.72% of the 21.70 acres of Common land presently devoted to park and recreational use.

12. Section 13(a), 71 P.S. § 512(a)(15) (Supp.1975–1976).

requires that various state agencies be consulted with regard to the potential for environmental harm engendered by the project[13] and that the cooperation of the political subdivision and interested private individuals and organizations be enlisted.[14] Where the project under consideration entails the acquisition of new or additional rights-of-way, the Act also mandates that a public hearing be held, at which the effects of the project in twenty-three enumerated areas are to be considered.[15] The

13. Section 13(a), 71 P.S. § 512(a)(15) (Supp.1975–1976).

14. Section 13(a), 71 P.S. § 512(a)(7) (Supp.1975–1976).

15. Section 13(b), 71 P.S. § 512(b) (Supp.1975–1976) provides:

"(b) Upon the submission of the preliminary plan or design to the Department of Transportation for any transportation route or program requiring the acquisition of new or additional right-of-way, the Department of Transportation except in cases involving complaint proceedings under the jurisdiction of the Public Utility Commission shall have the power and its duty shall be to follow the hearing procedures now or hereafter required by the Federal Government for Federal-aid transportation programs pursuant to Titles 23 and 49 of the United States Code as amended and the regulations and procedures thereunder even though the transportation route or program does not contemplate the use of or actually employ Federal funds. At the hearings required by this subsection the Department of Transportation shall consider the following effects of the transportation route or program:

(1) Residential and neighborhood character and location;

(2) Conservation including air, erosion, sedimentation, wildlife and general ecology of the area;

(3) Noise, and air and water pollution;

(4) Multiple use of space;

(5) Replacement housing;

(6) Displacement of families and businesses;

(7) Recreation and parks;

(8) Aesthetics;

(9) Public health and safety;

(10) Fast, safe and efficient transportation;

(11) Civil defense;

(12) Economic activity;

(13) Employment;

(14) Fire protection;

(15) Public utilities;

(16) Religious institutions;

hearing is to be conducted in compliance with established federal hearing procedures for federal-aid transportation programs.[16]  As a final precondition to Penn DOT approval of any such plan, the Secretary of Penn DOT, based upon consideration of the evidence at the hearing, must issue findings either that the project is likely to cause no adverse environmental impact in the specified area, or that no reasonable and prudent alternative exists and all possible efforts are being made to reduce the adverse effect to a minimum.[17]

■ Appellants insist that Pen DOT's handling of this case fails in virtually all these respects.  Specifically, it is claimed that Penn DOT abused its discretion and violated its statutory duties when it: (1) failed to consider all reasonable and prudent alternatives; (2) ap-

(17) Conduct and financing of government including the effect on the local tax base and social service costs;

(18) Natural and historic landmarks;

(19) Property values;

(20) Education, including the disruption of school district operations;

(21) Engineering, right-of-way and construction costs of the project and related facilities;

(22) Maintenance and operating costs of the project and related facilities;

(23) Operation and use of existing transportation routes and programs during construction and after completion.

At the hearings required by this section, the public officials named in clause (15) of subsection (a) of this section shall make a report indicating the environmental effects of the proposed transportation route or program.  The Department of Transportation shall not construct or reconstruct any portion of the transportation route or program unless the Secretary of Transportation makes a written finding published in the Pennsylvania Bulletin that:

(1) No adverse environmental effect is likely to result from such transportation route or program; or

(2) There exists no feasible and prudent alternative to such effect and all reasonable steps have been taken to minimize such effect.  For the purpose of this subsection environmental effect shall refer to the effects enumerated in this subsection."

16.  See note 15 *supra.*

17.  See note 15 *supra.*

proved a plan in which the adverse effects will not be reduced to a minimum; (3) failed to comply with the applicable procedure; and (4) failed to obtain the final approval of the City of Wilkes-Barre. The chancellor determined that every requirement of Act 120 had been fully met by Penn DOT. From our own examination of the record, we agree.

The record demonstrates that Penn DOT considered each of the alternatives for traffic improvement which appellants suggest [18] during the initial study phase prior to the April 20, 1971 public hearing. After study, these alternate plans were specifically rejected as imprudent and unfeasible. We agree, therefore, that the claim that all alternatives were not given full consideration is without merit. Similarly, appellants' charge that the present plan does not include efforts to minimize the adverse effects is simply not borne out by the record. The plan, briefly described earlier in this opinion, plainly demonstrates an effort to leave the affected area of the Common essentially unchanged in nature once the construction has been completed. The actual amount of land to be taken is small. The trees, sidewalks and the stone wall will be replaced; the historical significance of the markers which are to be moved will be in no way affected by their relocation. All in all, the record here indicates a commitment by the public officials involved to serve the spirit as well as the letter of Act 120. Whether they succeeded was, of course, a question in the first instance for the chancellor. He found that the proposed intrusion into the park would be relatively slight; would be at a point which is not critical to the use and enjoyment of the Common; and that, upon completion of the relandscaping and reconstruction work, the affected area will be essentially unaltered. His conclusion that reason-

18. These included: no action at all; the creation of a one-way couplet with River Street and a parallel street; and directing some traffic flow onto surrounding streets.

able efforts have been made to hold the adverse effect to a minimum in accordance with Act 120 was fully warranted.

Section 13(b) of Act 120 stipulates that "the hearing procedures" required by the federal government with respect to federal-aid transportation programs shall be followed by Penn DOT. 71 P.S. § 512(b). Appellants assert that the present practice of the federal Department of Transportation, where a proposed highway infringes on parkland, is to require specific findings at the administrative level as to the impact of the project in each respect enumerated by a statute, such as Act 120, implementing a federal aid program.[19] Because no such specific findings of this nature were made by the Secretary of Penn DOT, it is argued that the entire proceedings are invalid. We cannot agree. Granted that the procedure at hearings under Act 120 must track the federal procedure, appellants have not satisfied us that findings by the secretary are part of "hearing procedures". The evidence was extensive and detailed, and the secretary did indeed make findings. We hold that they were adequate in form and substance.

Finally with regard to Act 120, appellants claim that Penn DOT never obtained the final approval of the City of Wilkes-Barre for the project, allegedly a prerequisite to its legality, and, therefore improperly went forward with its own approval. The City Council of Wilkes-Barre gave conditional approval for the scheme on July 6, 1971, but took no further formal action. This non-action, in appellants' view, demonstrates that the City withheld its approval. But, as the chancellor noted, the city manager and the city engineer both testified that the final plan did meet with the City's approval. Even if this were not sufficient, the Act does not require ac-

19. Appellants, without citation or provision of a copy, refer to a United States Department of Transportation Order 5610.1.

tual approval of all aspects of the plan by the political subdivision wherein the affected land is located; it requires instead only that the cooperation of that political entity be enlisted in the formulation and the development of the plan. 71 P.S. § 512(a)(7). The chancellor's specific finding of fact that such cooperation was forthcoming was not excepted to by the appellants. In sum, then, the record supports the chancellor's conclusions that Penn DOT fully complied with the requirements of Act 120 and that the secretary did not abuse his discretion in striking the balance between the benefits and detriments of this project in favor of the project.[20]

## III.

Appellants' final argument is that the Commonwealth, through the action of Penn DOT in approving the River Street project, violated its duties as trustee under Article I, § 27 of the Pennsylvania Constitution, and that the enterprise must therefore be enjoined as unconstitutional. Article I, § 27 provides:

"The people have a right to clear air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

Appellants assert, and the appellees agree, that this provision is "self-executing" and that appellants have standing as beneficiaries of the public trust thereby cre-

20. Appellants also argue that Penn DOT failed to consult with the Pennsylvania Historical and Museum Commission as required by the Act of March 4, 1970, P.L. 117, No. 45, § 1, 71 P.S. § 716(j) (Supp.1975–1976). As explained by the chancellor, this assertion is directly refuted by the testimony of one of appellant's own witnesses, Edward F. LaFond, Jr.

ated to bring suit to enjoin the Commonwealth from breach of its duties as trustee. The Commonwealth Court agreed that the provision is self-executing and applicable here, but ruled that the mandate of Article I, § 27 had not been violated in this case.

We see no need, in this case, to explore the difficult terrain of whether the amendment is or is not "self-executing". That question may be of paramount importance when the Commonwealth as trustee is seeking to curtail or prevent the otherwise entirely legal use of private property on the ground that the proposed use impinges, in the words of the amendment's first sentence, on "natural, scenic, historic and esthetic values of the environment." See *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 311 A.2d 588 (1973). Here, however, the shoe is on the other foot, as it were. There can be no question that the Amendment itself declares and creates a public trust of public natural resources for the benefit of all the people (including future generations as yet unborn) and that the Commonwealth is made the trustee of said resources, commanded to conserve and maintain them. No implementing legislation is needed to enunciate these broad purposes and establish these relationships; the amendment does so by its own *ipse dixit*. There is also no doubt that the property here involved is public property, a "public Common", and that it is possessed of certain natural, scenic, historic and esthetic values. The deeds and the evidence establish as much. The only question is whether a court can proceed, on this basis and without more, to adjudicate the charge that the proposed road widening project "will violate the constitutional rights" of the plaintiffs to the preservation of those values (Complaint, par. 48f., at 16a); or stated another way, will violate the trust imposed on the Commonwealth to conserve those values (Complaint, par. 48g at 16a). On this record we see no impediment to asserting the constitutional claim. Cf. *Rhoades v. School*

246

*District of Abington Township*, 424 Pa. 202, 226 A.2d 53 (1967).[21]

██  But merely to assert that one has a common right to a protected value under the trusteeship of the State, and that the value is about to be invaded, creates no automatic right to relief.  The new amendment speaks in no such absolute terms.  The Commonwealth as trustee, bound to conserve and maintain public natural resources for the benefit of all the people, is also required to perform other duties, such as the maintenance of an adequate public highway system, also for the benefit of all the people.  See Sections 11 and 13(a) of Act 120, 71 P.S. 511, 513(a).  It is manifest that a balancing must take place, and by Act 120, discussed supra, the legislature has made careful provision for just that.[22]  Thus an area such as the River Common is to be avoided altogether for highway purposes if possible, but, if there is no feasible alternative, may be utilized in such a way as to minimize the environmental or ecological impact of the use.  The elaborate safeguards provided by Act 120 (see 71 P.S. § 512), if truly complied with by the governmental departments and agencies involved, vouchsafe that a breach of the trust established by Art. I, § 27 will

21.  Appellees do not dispute the Commonwealth Court's conclusion that members of the Wilkes-Barre public who use the Common and whose rights under Article I, § 27 are allegedly adversely affected (appellants) have standing to proceed with their claim. In this case we have no occasion to disagree with that proposition.  See generally *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A.2d 138 (1966); *Mayer v. Hemphill*, 411 Pa. 1, 190 A.2d 444 (1963); *Page v. King*, 285 Pa. 153, 131 A. 707 (1926). See also *Philadelphia Life Insurance Company v. Commonwealth*, 410 Pa. 571, 190 A.2d 111 (1963); *Pennsylvania Gas and Water Co. v. Kassab*, 14 Pa.Cmwlth. 564, 322 A.2d 775 (1974).

22.  Article I, § 27 was adopted by the voters on May 18, 1971.  It was first passed on by the Legislature in 1969 and was amended and then approved in 1970.  *See* Broughton, "The Proposed Pennsylvania Declaration of Environmental Rights, Analysis of HB 958", 41 Pa.Bar Assoc.Quarterly 421 (1970).  Act 120 was enacted on May 6, 1970.

not occur.[23] Having determined that Act 120 was complied with, we have no hesitation in deciding that the appellee Commonwealth of Pennsylvania has not failed in its duties as trustee under the constitutional article.

Decree affirmed. Each party to bear own costs.

EAGEN, J., concurs in the result.

ROBERTS, J., filed a dissenting opinion.

JONES, C. J., did not participate in the consideration or decision of this case.

ROBERTS, Justice (dissenting).

I dissent. In my view, the proposed widening of River Street violates the statutory dedications of the land as a public common.

In 1807 the Pennsylvania Legislature dedicated a portion of the land in question in the following terms:

"And be it further enacted . . . That all that certain tract of land fronting the town lots in the borough of Wilkes-Barre, on the bank of the Susquehanna . . . be, and the same hereby is granted and set apart *as a public common, and to remain as such forever.*"

Act of April 9, 1807, Section III, 4 Sm.L. 411, Law Book Vol. XI at 47. (Emphasis added.)

---

**23.** We note that the Commonwealth Court, in fashioning a three-part test to determine whether Article I, § 27 has or has not been observed, requires nothing more in this case than does normal appellate review of Penn DOT's actions under Act 120. The factors identified by the Commonwealth Court were the following:

"(1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?" 11 Pa.Cmwlth. at 29–30, 312 A.2d at 94.

Another parcel for the Common was dedicated by the Legislature in 1846:

"That all that certain tract of land, fronting the town lots in the borough of Wilkes-Barre, on the bank of the Susquehanna . . . and the same hereby is granted and set apart *as a public common,* and to be under the control and jurisdiction of the town council of said borough."

Act of March 28, 1946, P.L. 196, § 6. (Emphasis added.)

The dedications expressly grant the land for use "as a public common." The majority finds that the use of part of that land as a road does not violate the dedications. I cannot agree.

The majority concedes that our case law is that "land so dedicated . . . may be diverted by the responsible public officials neither to private uses . . . nor to public uses not within those designated or specified in the dedicatory language." Yet that is precisely what is being done here. Although using the land as widened street is, no doubt, a public use as the majority finds, it is not use of the land as a "common" as I understand that term. The majority incorrectly equates "public use" with "public common." Nor can I conclude, as the majority seems to, that such a taking of more than one half acre of the Common land for use as a street is de minimis.

I am also not persuaded that Penn DOT sustained its burden under Section 13 of the Act of May 6, 1970, P.L. 356, No. 120, as amended, 71 P.S. § 512 (Supp.1976), of showing that there is no feasible alternative to use of this historic and recreational land.