# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brockway Borough Municipal
Authority,
               Petitioner

           v.

Department of Environmental
Protection,
               Respondent

:
:
:
:
:
:
:
:
:
:
:
:

No. 789 C.D. 2015
Submitted: November 16, 2015

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge[1]
                 HONORABLE MARY HANNAH LEAVITT, Judge[2]
                 HONORABLE PATRICIA A. McCULLOUGH, Judge

OPINION
BY JUDGE LEAVITT                         FILED: January 6, 2016

        The Brockway Borough Municipal Authority (Authority) appeals an order of the Environmental Hearing Board (Board) that dismissed the Authority's challenge to the issuance of a gas drilling permit by the Department of Environmental Protection (Department) to Flatirons Development Co. (Flatirons). The Authority contends that the Board's decision is not supported by substantial evidence and violates Pennsylvania environmental law and Article I, Section 27 of the Pennsylvania Constitution. For the reasons that follow, we affirm.

---

[1] This case was assigned to the opinion writer before December 31, 2015, when President Judge Pellegrini assumed the status of senior judge.

[2] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

## Background

The Authority owns and operates a water system in Jefferson County. The system consists of a surface water reservoir on the Whetstone Branch; a surface water reservoir on Rattlesnake Creek; separate surface water treatment facilities for each source; a storage and distribution system that serves customers in the Borough; and three groundwater wells, Well Nos. 2, 5, and 6. Of those wells, Well No. 5, which is relevant to this appeal, is a 200-foot deep water well that produces an artesian flow of water to the ground surface, at a rate that generally varies between 15 gallons per minute and 75 gallons per minute. Well No. 5 feeds groundwater into the Rattlesnake Creek reservoir.

Flatirons is a Colorado-based company engaged in oil and gas exploration in Pennsylvania and elsewhere. On July 14, 2010, the Authority and Flatirons entered into a Surface Use and Damage Agreement and Easement that granted Flatirons the right to drill for gas on the Authority's land. Under this agreement, Flatirons has agreed, *inter alia*, to cover the cost of quarterly water quality monitoring of the Authority's water system.

The genesis of the Authority's concern was the drilling techniques Flatirons employed while drilling its "1H Well" on Well Pad 6, which is located 960 feet from Well No. 5.[3] On February 10, 2011, during the drilling of the 1H Well, Well No. 5 stopped producing an artesian flow for approximately 29 hours.

---

[3] The Department approved Flatirons' permit application to drill the 1H Well on August 20, 2010.

When flow was restored, Well No. 5's turbidity[4] had quintupled, and the flow had increased by five gallons a minute.

On February 15, 2011, the Department issued a Notice of Violation to Flatirons for the 29-hour loss of flow from Well No. 5 on the basis that Flatirons may have violated the statutes commonly referred to as the Clean Streams Law[5] and the Oil and Gas Act.[6] The purpose of the notice was to advise Flatirons that the Department was investigating the water stoppage. In the end, however, the Department's investigation did not produce any evidence of wrongdoing by Flatirons. As such, the Department did not fine or penalize Flatirons for the stoppage of water flow.

On May 24, 2011, the Department approved a permit application filed by Flatirons to drill a second well (the "2H Well") on Well Pad 6, subject to the condition that Flatirons submit a plan to minimize the impact on the Authority's Well No. 5. Flatirons hired an engineering consulting firm, Moody & Associates, to prepare a plan to comply with the Department's condition. Moody & Associates prepared the "Brockway Borough Municipal Authority Well No. 5 Protection Plan," which was submitted to both the Department and the Authority. On August 3, 2011, the Department conducted a conference in which Flatirons, the Authority,

---

[4] Turbidity is a measurement of pollution. It is measured in Nephlometric Turbidity Units (NTU). At the hearing, an expert witness testified about how turbidity measurements are made:

> Turbidity is an established measurement of the turbidity of the water, the cloudiness of the water, like unit measurement of water. It is done through a sampling technique that sends a light beam through a column of water and essentially measures the amount of light that is reflected back out of the particles.

Reproduced Record at 645-46 (R.R. __).

[5] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§691.1-691.1001.

[6] 58 Pa. C.S. §§3201-3274.

and members of the Brockway Area Clean Water Alliance participated. The conference allowed concerned parties to voice objections and suggestions to Flatirons' plan. On January 26, 2012, Flatirons submitted a revised draft of its protection plan that incorporated comments made at the August 3rd conference. Because the Authority was not satisfied with the revised plan, another public meeting was held on February 22, 2012. Flatirons took note of the concerns raised and incorporated them into a second revised protection plan.

On May 24, 2013, the Department issued Flatirons a permit to drill the proposed 2H Well, subject to the following special conditions:

> Flatirons will notify the [Authority] 24 hours before drilling of the well commences;
>
> Flatirons will implement the alternate method for casing the well as outlined in the Proposed Alternate Method or Material for Casing, Plugging, Venting or Equipping form, 5500-PM-OG0024, submitted February 1, 2012;
>
> Flatirons will implement the provisions in the ... Protection Plan ... for the following, as provided in the plan:
>
>> Under balanced drilling technique
>>
>> Casing specifics and cementing plan
>>
>> Pump testing plan
>>
>> Water quality sampling and flow monitoring
>>
>> Contingency measures
>
> Flatirons will implement Green Completion flowback to minimize flaring and/or venting of gas during completion operations.
>
> The permittee shall not withdraw or use water from water sources within the Commonwealth of Pennsylvania, for well drilling and fracing [hydraulic fracturing] activities unless the

4

permittee does so in accordance with a Water Management Plan approved by the Department.

Permittee shall obtain a permit or Environmental Assessment approval from the Department prior to the construction of any dam, reservoir, water obstruction, and/or encroachment for which a permit or Environmental Assessment approval is required by 25 Pa. Code Chapter 105. Any dam embankment including centralized dam embankments utilized to impound freshwater or frac water associated with well fracing not requiring a permit pursuant to 25 Pa. Code Chapter 105 will be constructed in accordance with requirements of 25 Pa. Code §§78.56-78.63 and Department guidelines 5500-PM-OG0085 entitled, Design, construction and maintenance standards for dam embankments associated with impoundments for oil and gas wells.

Prior to fracturing the well, as part of its Preparedness, Prevention and Contingency Plan the permittee shall implement a Control and Disposal Plan for the control and disposal of fluids and residual wastes in accordance with 25 Pa. Code § 78.55. The Control and Disposal Plan shall identify the control and disposal methods and practices utilized to prevent pollutants from directly or indirectly reaching waters of the Commonwealth during the impoundment, production, processing and transportation of pollutants, including identification of the permitted processing or disposal facilities where residual wastes will be processed or disposed, in accordance with 25 Pa. Code §§ 78.55 and 91.34.

Prior to transport of the residual wastewater off site, chemical analysis and characterization of the waste shall be conducted and provided to the processing or disposal facility intended for acceptance of the waste in accordance with 25 Pa. Code § 287.54.

The operator shall run a complete angular deviation survey of the intentionally deviated well. The deviation survey is to be obtained by a responsible well surveying company and shall be filed with the Department within thirty (30) days after drilling is completed along with other regularly required reports. The deviation report shall include a well location plat and vertical section of the borehole as drilled.

Reproduced Record at 1064-1065 (R.R. ___).[7]

On June 25, 2013, the Authority filed a notice of appeal with the Board, objecting to the Department's issuance of the 2H Well Permit. The Authority argued that, based on the environmental harm that occurred during the drilling of the 1H Well, Flatirons' drilling of the 2H Well will result in violations of the Oil and Gas Act, the Clean Streams Law, and Article I, Section 27 of the Pennsylvania Constitution, commonly referred to as the Environmental Rights Amendment. Flatirons intervened, and hearings were held on May 20, 21, and 22, 2014.[8]

Michael Arnold, a member of the Authority, testified on behalf of the Authority. He explained that the Authority's water system needs a daily average of 500,000 gallons of water to meet customer demand. According to Arnold, the Authority's water sources can supply a total of 1.5 million gallons per day. The Whetstone Reservoir and its associated groundwater sources alone can supply one million gallons per day. Because Well No. 5 feeds the Rattlesnake Reservoir, the

---

[7] The Authority did not number the Reproduced Record in accordance with PA. R.A.P. 2173, which requires a lowercase "a" to follow the numeric number on the page.

[8] The following individuals testified on behalf of the Authority: Michael Arnold, the Chairman of the Authority's Board of Directors; August Genevro, one of the Authority's Secretaries; Mike Starr, a Field Supervisor for the Authority; Robert Reisinger, a Project Manager for Glace Associates; Anthony Patruzzi, a waterman operator for the Authority; Frank Uhl, one of the Authority's Board members; and Steven Read, a hydrogeologist. The following individuals testified on behalf of Flatirons: Andrew Esparza, the Manager Director of Flatirons; Todd Huey, Flatirons' Operations Superintendent; Jeffrey Jones, an employee of Flatirons; and Burt Waite, a geologist with Moody & Associates. The following individuals testified on behalf of the Department: Craig Lobins, a hydrogeologist employed by the Department; Joseph Brancato, an employee of the Department; Joseph Lichtinger, a geologist employed by the Department; and Brad Vanderhoof, the manager of the Department's Safe Drinking Water Program.

Authority had no problem meeting customer demand while Well No. 5 stopped producing water.

August Genevro, another member of the Authority, testified regarding the turbidity levels of Well No. 5 immediately prior to and after the drilling of Flatirons' 1H Well. Specifically, Genevro testified that before Flatirons drilled the 1H Well, the turbidity in Well No. 5 was .27 NTU, whereas after the drilling, Well No. 5 had a turbidity of 1.38 NTU. Genevro testified that the nearly fivefold jump in turbidity worried him, but he did not elaborate on this worry. Genevro opined that he believed the turbidity increase was caused by the 1H Well drilling.

The Authority presented the testimony of one expert witness, Steven Read, a hydrogeologist who has worked extensively with the Authority's water supply system. Read admitted on cross-examination that he had never investigated the impact of deep oil and gas drilling upon groundwater. As such, Read was not asked to testify regarding what happened during the drilling of the 1H Well, nor was he asked to give an expert opinion about what would happen during the drilling of the 2H Well. Rather, Read was questioned only about "his general knowledge and what he understands the parameters of [the] water system to be." R.R. 168. Read did not testify regarding the cause of Well No. 5's water stoppage or the increase in turbidity.

Flatirons presented the testimony of four witnesses, two of whom were experts, and the Department presented the testimony of four witnesses, all of whom were experts. One of Flatirons' expert witnesses, Burt Waite, a geologist, testified that his employer, Moody & Associates, was hired by Flatirons to determine the cause of the 29-hour loss of water in Well No. 5. Accordingly,

Waite conducted an independent investigation of the incident. Ultimately, Waite concluded that Flatirons had done nothing wrong.

Furthermore, Waite downplayed the significance of the water stoppage by explaining that, even though Well No. 5 had stopped producing an artesian flow, the well could still have been pumped if necessary. Thus, Waite was not concerned that the drilling of the 2H Well could likely cause a similar loss in artesian flow. R.R. 560-61. Waite also reached a different conclusion than Genevro regarding the cause of the increase in turbidity of Well No. 5 after the drilling of the 1H Well. Waite explained:

> I think a solid conclusion [is] that what we are seeing … is not as a result of drilling the 1H Well…. I think [1] it is natural variability in groundwater and [2] a difference in sampling locations and [3] the introduction of the possibility of oxidation of iron in the water as it travels through that pipe.

R.R. 533-34.

In sum, Waite succinctly answered the following questions that go straight to the heart of the dispute *sub judice*:

> [Counsel for Flatirons]: [B]ased on your review of the events, the facts we've just discussed, including your [reports], do you have an opinion on what caused the temporary loss of water flow of artesian flow from Well 5?
>
> [Waite]: I think it was as a result of bringing water to the surface during the drilling of the 1H Well.
>
> [Counsel for Flatirons]: And do you have an opinion on whether that temporary loss of the artesian flow affected the Authority's ability to serve customers from the Rattlesnake system or water treatment system?
>
> [Waite]: No, my understanding is it did not.

> [Counsel for Flatirons]: Okay. Do you have an opinion on whether the flow at Well 5 changed in quality after the artesian flow resumed?
>
> [Waite]: No, it did not.
>
> [Counsel for Flatirons]: And do you have an opinion as to whether it changed in quantity from pre-drilling conditions after the well resumed flowing -- artesian flow began or resumed flowing at Well 5?
>
> [Waite]: No, it did not.

R.R. 541.

Craig Lobins, an expert witness and hydrogeologist for the Department, testified about his investigation of Flatirons' drilling methodology. According to the results of Lobins' investigation, Well No. 5 lost its flow as a result of Flatirons' use of the "underbalanced drilling" technique, a technique the Department requires that Flatirons use. R.R. 583. Lobins explained that underbalanced drilling is the Department's preferred technique because it requires pumping water out of the ground as the drill works its way to the oil. The Department prefers this method over the "overbalanced drilling" technique because overbalanced drilling requires pumping chemicals into the ground, instead of out of the ground. Lobins admitted that the overbalanced method would not disrupt the flow of Well No. 5, but argued that it is nevertheless a more environmentally dangerous technique.

Lobins further testified about why the Notice of Violation did not result in penalties or fines:

> [Counsel for Flatirons]: I want to come back real quick to the notice of violation the Department had issued to Flatirons regarding the temporary interruption to the artesian flow to Well Number 5. Based on all of the information that you and your staff reviewed during the review of the 2H, do you have an

9

opinion as to whether that -- this Well Number 2[H] will cause a violation?

[Lobins]: It will not cause a violation.

[Counsel for Flatirons]: Do you have an opinion as to whether the interruption that was experienced during 1H was actually a violation or not?

[Lobins]: No, it was not. After further understanding of the problem, what happened, I don't view that as a violation even though I sent a notice of violation.

[Counsel for Flatirons]: Okay. And why is that?

[Lobins]: Because there is just a pressure drop. The piesimetric surface was lower. There was not a loss of flow. It was not a true diminution of a water supply.

[Counsel for Flatirons]: In essence, do you think the temporary interruption to the artesian flow of Well Number 5 had any impact to Well Number 5's yield?...

[Lobins]: No, it did not. And that is why it is not a diminution.

R.R. 588-89. Moreover, Lobins stressed that the Department reviewed Flatirons' permit application more thoroughly than any other application ever presented. As such, Lobins was confident that the Department made the right decision in granting Flatirons' permit.

On April 24, 2015, the Board dismissed the Authority's appeal. The Board reasoned:

The Authority, of course, bears the burden of proof in its appeals. The difficulty with the Authority's case is that it gave us very little to go on in the way of supported criticisms of the Department's conclusions. This is a very technical case involving not only the intricacies of drilling but the science of hydrogeology as well. We are highly dependent on expert testimony in such cases. The only expert testimony offered by the Authority was that of Steven Read, a hydrogeologist.… [However,] Read could only generally opine on the types of

10

> concerns that he would have with oil and gas drilling on the Authority's property.

Board Adjudication at 17-18. As such, the Board concluded that "without the support of expert testimony, the Authority's arguments that the 2H Well will cause untoward harm amount to little more than conjecture." Board Adjudication at 19.

However, not only did the Board conclude that the Authority did not meet its burden, the Board held further that Flatirons and the Department supported their positions with substantial and competent evidence. As such, the Board determined that any effects on Well No. 5 from the drilling of the 2H Well would not violate any Pennsylvania laws. Citing *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973), *aff'd*, 361 A.2d 263 (Pa. 1976), the Board stated that "[it] is a fact of life that normal development cannot be accomplished without *some* environmental incursion." Board Adjudication at 23 (emphasis in original). Accordingly, the Board dismissed the Authority's petition. The Authority appealed to this Court shortly thereafter.

## Issues

On appeal,[9] the Authority contends that the Board's conclusion that the drilling of the 2H Well will not result in a violation of the Clean Streams Law and the Oil and Gas Act is inconsistent with the record evidence. The Authority argues that, to the contrary, the permit will result in violations of the Clean Streams Law, the Oil and Gas Act or Article I, Section 27 of the Pennsylvania Constitution.

---

[9] "Our scope of review of an order of the Board is whether the Board committed an error of law or a constitutional violation, or whether any necessary findings of fact are not supported by substantial evidence." *The Ainjar Trust v. Department of Environmental Protection*, 806 A.2d 482, 487 (Pa. Cmwlth. 2002).

11

Flatirons and the Department disagree, noting that the Board's factual findings are supported by substantial evidence, including the testimony of six expert witnesses who rebutted the Authority's single expert. Likewise, the Board's legal conclusions on the Clean Streams Law, the Oil and Gas Act and Article I, Section 27 of the Pennsylvania Constitution are all fully consonant with the record evidence.

## The Clean Streams Law and the Oil and Gas Act

We begin with a review of the specific violations of the Oil and Gas Act and the Clean Streams Law that the Authority contends Flatirons violated and will violate again. Specifically, the Authority contends that Flatirons violated Section 3218 of the Oil and Gas Act, which requires that

> a well operator who affects a public or private water supply by pollution or diminution shall restore or replace the affected supply with an alternate source of water adequate in quantity or quality for the purposes served by the supply.

58 Pa. C.S. §3218(a). The Authority reasons that because Flatirons stopped Well No. 5 from flowing for 29 hours without supplying an alternative water supply, Flatirons diminished the Authority's water supply. As such, because the drilling of the 2H Well will likely cause the same stoppage, the Department should have denied Flatirons' application pursuant to Section 3211(e.1) of the Oil and Gas Act, which allows the Department to deny a permit where its issuance "would result in a violation of this chapter or other applicable law." 58 Pa. C.S. §3211(e.1).

The Authority also argues that Flatirons violated Section 401 of the Clean Streams Law, which states:

> It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or

permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance.

35 P.S. §691.401. According to the Authority, the increase in turbidity in Well No. 5 is evidence that Flatirons was discharging pollution.[10]

The Authority's arguments relate to the weight of the evidence, not whether the Board's findings of fact were supported by substantial evidence. The Authority asks this Court, improperly, to re-weigh the evidence and make new, independent findings of fact different from those of the Board. The Board is the sole finder of fact and has discretion regarding witness credibility, weight of the evidence, and resolution of conflicts of evidence. *The Ainjar Trust v. Department of Environmental Protection*, 806 A.2d 482, 488 (Pa. Cmwlth. 2002). The Authority cannot pull bits and pieces of evidence from the record to support alternative findings of fact.

---

[10] Section 1 of the Clean Streams Law defines "pollution" as:

[The] contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The department shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.

35 P.S. §691.1.

13

Stated otherwise, the Authority had the burden to prove, by a preponderance of evidence, that the Board's issuance of the 2H Well Permit was unreasonable and contrary to law. 25 Pa. Code §1021.122.[11] The appeal involved technical issues such as the intricacies of drilling and the science of hydrogeology. Expert testimony is required where the issues require scientific or specialized knowledge or experience to understand. *Department of Transportation v.*

---

[11] This regulation states:

(a) In proceedings before the Board, the burden of proceeding and the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue. It shall generally be the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence. In cases where a party has the burden of proof to establish the party's case by a preponderance of the evidence, the Board may nonetheless require the other party to assume the burden of proceeding with the evidence in whole or in part if that party is in possession of facts or should have knowledge of facts relevant to the issue.

(b) The Department has the burden of proof in the following cases:

(1) When it assesses or files a complaint for a civil penalty.

(2) When it files a complaint for any other purpose.

(3) When it revokes or suspends a license, permit, approval or certification.

(4) When it issues an order.

(c) A party appealing an action of the Department shall have the burden of proof in the following cases:

(1) When the Department denies a license, permit, approval or certification.

(2) When a party who is not the recipient of an action by the Department protests the action.

(3) When a party to whom a permit approval or certification is issued protests one or more aspects of its issuance or modification.

(4) When a party appeals or objects to a settlement of a matter between the Department and another private party.

25 Pa. Code. §1021.122.

*Agricultural Lands Condemnation Approval Board*, 5 A.3d 821, 828-29 (Pa. Cmwlth. 2010). The Authority did not support its claims with credible expert testimony and, thus, failed to meet its burden of proof. By contrast, Flatirons and the Department provided ample credible testimony from six expert witnesses that refuted all of the Authority's allegations. We reject the Authority's contention that the Board's findings of fact are not supported by substantial evidence.

The Authority next argues that the Board erred in concluding that the drilling of the 2H Well will not result in a violation of the Cleans Streams Law or the Oil and Gas Act. In support of its position, the Authority relies on the uncontested fact that the drilling of the 2H Well will have an identical effect on Well No. 5 as the drilling of the 1H Well. However, this argument is unpersuasive. The Board did not base its conclusion on a lack of any environmental impact. The Board merely concluded that the impact was not one that violated the Oil and Gas Act or the Clean Streams Law. The Board astutely wrote:

> It is a fact of life that normal development cannot be accomplished without *some* environmental incursion. *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973), *aff'd*, 361 A.2d 263 (Pa. 1976). One cannot walk across a stream without stirring up some sedimentation, which might constitute a discharge of pollutants in some pedantic sense. The point of the environmental laws is not to prohibit the discharge of all pollutants, but to intelligently regulate such activity so that regulatory standards are met, environmental incursions are minimized, and any remaining harms are justified *Id.*

Board Adjudication at 23 (emphasis in original). We agree with the Board that the environmental incursion caused by the drilling of the 1H Well and projected to be caused by the 2H Well does not trigger a violation of either the Clean Streams Law or the Oil and Gas Act.

15

For instance, the Authority argues that Flatirons violated Section 3218 of the Oil and Gas Act because it affected "a public or private water supply by … diminution." 58 Pa. C.S. §3218. However, evidence was presented that, even though Well No. 5 did not have an artesian flow for 29 hours, the well still could have been pumped. *See* R.R. 536. Furthermore, the Authority's other wells produced sufficient water for the Authority to meet customer demand. *See* R.R. 120. For these reasons, the Department's expert witness, Craig Lobins, testified that the 29-hour loss "was not a true diminution of a water supply." R.R. 589. Thus, although Flatirons' drilling activities may result in a diminution of artesian flow from Well No. 5, the dimunition is not so severe as to constitute a violation of Section 3218 of the Oil and Gas Act.

Similarly, we reject the Authority's claim that Flatirons violated Section 401 of the Clean Streams Law, 35 P.S. §691.401, because the turbidity of Well No. 5 was higher after drilling the 1H Well than before. Flatirons presented expert testimony that the rise in turbidity was not related to Flatirons' drilling. *See* R.R. 533-34. Rather, expert testimony showed that the higher turbidity levels were actually within the normal seasonal range of variation for Well No. 5. *See* R.R. 533-34. Therefore, even though Well No. 5 may have higher turbidity after the 2H Well is drilled, that fact alone does not prove that Flatirons discharged pollutants into the water supply in violation of Section 401 of the Clean Streams Law.

Because the Board's findings of fact support its conclusion that no violations of either the Oil and Gas Act or the Clean Streams Law has occurred, or will occur, we agree with the Department that the Board did not commit an error of law.

16

### Article I, Section 27 of the Pennsylvania Constitution

Finally, the Authority argues that the Board erred in allowing the Department to issue Flatirons a permit because the Authority's natural resources will be injured in violation of Article I, Section 27 of the Pennsylvania Constitution, which states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, §27. When determining whether an action violates Article I, Section 27 of the Pennsylvania Constitution, this Court must weigh the following considerations:

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

*Payne*, 312 A.2d at 94.

Regarding the first prong of the *Payne* test, the Authority claims that issuing the 2H Well Permit violates the Oil and Gas Act and the Clean Streams Law because it will result in diminution of the water supply and discharges of industrial waste into the waters of the Commonwealth. However, as set forth above, no violation of the Oil and Gas Act or the Clean Streams Law occurred

during the drilling of the 1H Well. Thus, the Board properly determined that the Authority failed to meet its burden under the first prong of the *Payne* test.

Moreover, the Department's issuance of the 2H Well Permit also satisfied the second prong of the *Payne* test. Specifically, the Department included nine special conditions in the 2H Well Permit to mitigate any potential harm to the Authority's water supply or the environment. Among the special conditions in the 2H Well Permit is the requirement for underbalanced drilling and the implementation of the alternate cementing and casing plan designed to minimize cement being lost into the aquifer. The Department's other conditions require Flatirons to study and monitor the aquifer before, during, and after the drilling of the 2H Well. In short, the record shows that the Board properly determined that the Department made a reasonable effort to minimize any environmental incursion.

The Authority failed to prove or even argue that any environmental harm that will result from the drilling of the 2H Well will so clearly outweigh the benefits to be derived from the drilling that issuance of the 2H Well Permit constitutes an abuse of discretion. As such, no further analysis is necessary. Accordingly, because all prongs of the *Payne* test weigh in favor of constitutionality, the Board did not err in concluding that the Department did not violate Article I, Section 27 by issuing the 2H Well Permit to Flatirons.

## Conclusion

Because we find that the Board's findings of fact are supported by substantial evidence and its conclusions of law are consonant with those findings, we affirm the Board's adjudication.

_____
MARY HANNAH LEAVITT, Judge

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brockway Borough Municipal
Authority,
                Petitioner

          v.

Department of Environmental
Protection,
                Respondent

        :    No. 789 C.D. 2015

## **O R D E R**

AND NOW, this 6th day of January, 2016, the order of the Environmental Hearing Board dated April 24, 2015, in the above-captioned matter is AFFIRMED.

_____
MARY HANNAH LEAVITT, Judge