## BOARD OF SUPERVISORS OF SPRINGFIELD TOWNSHIP, Petitioner

v.

## PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 19, 2011.

Decided Jan. 13, 2012.

Scott J. Rubin, Bloomsburg, for petitioner.

Robert F. Young, Deputy Chief Counsel, and Patricia T. Wiedt, Assistant Counsel, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor PPL Electric Utilities Corporation.

11.   In light of this holding, we need not ad-    dress Father's constitutional issue.

BEFORE: LEADBETTER, President Judge,[1] and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and BUTLER, Judge.[2]

OPINION BY Judge PELLEGRINI.

Springfield Township petitions for review of an order of the Pennsylvania Public Utility Commission (Commission) granting a certificate of public convenience to PPL Electric Utility Corporation (PPL) to construct a seven-mile high-voltage (HV) electric transmission line and substation using the "PPL Functional Configuration" rather than the "Springfield Configuration." For the reasons that follow, we affirm the Commission's decision.

I.

This case deals with the need for an upgrade to Lehigh Valley's HV electric transmission network and the best way to meet that need. Due to the rapid growth in PPL's southern Lehigh Valley region, a great demand has been placed on PPL's existing electrical facilities and it has to reinforce the existing 69 kV transmission system serving Northern Bucks and Southern Lehigh and Northampton Counties. The problems consist of conductor and transformer overloads and low voltage, as well as the long range requirements for PPL's Southern Lehigh region up through the year 2020. Failure to reinforce the facilities affects reliable service to the public and will create the potential for loss of service to many of PPL's customers in the area.

To alleviate this problem, PPL engineers need to evaluate electrical solutions or "functional configurations" to identify the best solutions to resolve the reliability issues. "A 'functional configuration' is a potential electrical solution that addresses the reliability issues based upon engineering considerations as determined by engineers in PPL electric's Planning Department ... (Citations omitted.) Stated otherwise, a functional configuration is simply an electrical solution; it does not identify or evaluate the project location or alternative routes for the associated transmission lines." (PPL's brief at 13.) PPL further explained that after the functional configurations are identified, it compares and selects the one configuration that best meets its customers' electric needs in a reliable manner over its planning horizon which, in this case, would be until the year 2020:

> The evaluation of alternative functional configurations considers the ability of each solution to solve the original reliability problem and provide the ability and flexibility to meet future system needs, as well as the overall cost. Importantly, a full siting analysis is not part of the initial determination of alternative functional configurations; rather, a functional configuration is selected on the basis of how well it accomplishes PPL Electric's statutory obligation to provide safe and reliable service to its customers over time and at a reasonable cost. Simply stated, a full siting analysis, including consideration of the environmental impacts, is not conducted at this stage because a functional configuration is not an alternative route for a high voltage transmission line but, rather, is a possible electrical or engineering

---

1. This case was assigned to the opinion writer before Judge Pellegrini succeeded Judge Leadbetter as President Judge.

2. This case was decided before Judge Butler's term ended on January 2, 2012.

solution to an identified reliability problem.

(PPL's brief at 13–14.)

In this case, PPL studied two functional configurations for enhancing the reliability of its transmission grid in the region. The first option, referred to as the "Springfield Functional Configuration," involved constructing a new three or four-mile HV transmission line. The second option, referred to as the "PPL Functional Configuration," involved constructing a new substation in Springfield Township and constructing a new six-or-seven-mile HV transmission line beginning in Southern Lehigh County and traversing through Springfield and Richland Townships in Northern Bucks County. PPL selected the PPL Functional Configuration because it believed that method was less expensive and provided flexibility for predicted future system expansion needs. Specifically, the PPL Functional Configuration would eliminate overload and excessive voltage drop violations and improve reliability by providing additional high-capacity transmission lines and increased substation transmission capacity for the region. It would also improve transfer capability for load restoration and increase load sectionalizing flexibility for line maintenance. Without the new substation, the load would be served by the Hosensack substation which was eight miles away and would not provide the same benefits, reliability and flexibility. The Springfield Functional Configuration would not provide the degree of load transfers and re-sectionalizing of load because of the magnitude of customer load supplied by the

longer transmission paths. It would also require longer lines; would require transformer reinforcements at existing regional substations; and would require rebuilding the substation structures, which would be difficult because all substation loads would need to be transferred away to temporary substation facilities during construction. It would also have substantial social impacts because the transmission lines would cross densely populated areas and impact numerous homes. Last, but not least, the cost of the PPL Functional Configuration, for just those portions to be constructed through 2011, was $36 million compared to the $41 million it would cost to construct the Springfield Functional Configuration for the same time period.

After PPL chose the PPL Functional Configuration, it then presented the preferred functional configuration to PPL's siting team which conducted a general review of the relevant area. This included a preliminary consideration of the environmental impacts of the selected functional configuration. If the siting team had found the selected functional configuration had significant environmental or other relevant impacts, the siting team would have communicated its concerns to the planning department for further consideration of an alternative functional configuration. Because that did not occur, the siting team then conducted a full siting analysis to identify and analyze possible alternative routes for the HV transmission lines that would be necessary to implement the selected functional configuration.

PPL analyzed three line route options: "the Cross Country Corridor;"[3] "the

3. The Cross Country Corridor was approximately 7.09 miles long. This corridor was sited to avoid a 106–acre tract of land dedicated to open space and owned by Richland Township. It crossed SEPTA's Bethlehem Branch Line in an industrial and warehous-ing area and crossed Quakertown Borough's Memorial Park to the intersection with the existing Buxmont–Quakertown # 1 and # 2 kV transmission line which connected to the Quakertown substation. Because the corridor crossed the Hickon substation, no addi-

Route 309 Line;"[4] and "the SEPTA line."[5] After reviewing the associated costs and other considerations, PPL selected the Cross Country Corridor.

## II.

On February 14, 2008, PPL filed an application with the Commission for approval of the siting and reconstruction of the proposed the Coopersburg # 1 and # 2 138/69 kV Tap in Upper Saucon Township, Lehigh County and Springfield and Richland Townships, Bucks County, Pennsylvania. It also sought to construct a related substation control building at Hickon Road in Springfield Township to protect control

tional transmission lines were required to connect the substation to the distribution electrical grid. The estimated cost of the project was $13.1 million.

4. The Route 309 Corridor was approximately 9.59 miles and required tie lines to the Hickon substation. As the corridor approached Richland Township, the line crossed an unnamed tributary of the Hickon Creek and encroached on a 100–year flood plain. The cost of this corridor was $5.2 million, and approximately $6.6 million was attributed to connecting it to the Hickon substation. PPL considered Route 309 Corridor a closer substation site than the Hickon substation, but the environmental impacts (woodlands) made it undesirable. The corridor crossed two unnamed tributaries of the Tohickon Creek and their associated 100–year flood plains. The final 4,000 feet crossed the Route 309 Woods, an outstanding natural area and one of the few remaining natural areas left along this section of Route 309.

5. The SEPTA Corridor was about 9.45 miles long and included tie lines to the 230–138/69 kV Hickon substation. The terrain was relatively flat due to the close proximity to the railroad. Steep slopes existed immediately adjacent to the rail bed. The corridor also crossed two natural gas interstate pipelines owned by Columbia Gas Transmission Corporation. In Springfield Township, the corridor was flat but about 3,300 feet laid within the 100–year flood plain of the Hickon Creek. In the Township, areas to the west of the corri-

equipment (the Substation).[6] PPL further sought to acquire rights-of-way (ROW) for the construction, use, operation, repair and maintenance of the preferred route for its transmission line, the proposed Cross Country Corridor. PPL filed several applications for approval to exercise the power of eminent domain to acquire ROWs and easements necessary for the construction, operation and maintenance of the proposed Cross Country Corridor.

Numerous parties filed protests to the application and various parties filed petitions to intervene based on environmental concerns, including Springfield Township (Township).[7] On August 12, 2008, tour

dor were zoned commercial and areas to the east of the corridor were zoned environmentally protected. The final 3.2 miles of the corridor ran through Richland Township. That section crossed the Hickon and Tohickon Creeks and one unnamed tributary. A 1,800 foot section of the corridor in Richland Township was within the 100–year flood plain. That portion was in close proximity to several residential areas, the most prominent of which was the Melody Lakes Mobile Home Park. The estimated cost was about $31 million.

6. PPL purchased approximately 85 acres of property in the Township in November 2006 for this purpose. The control building and substation will occupy approximately seven acres. According to PPL, "[t]he control equipment building is required for proper protection and operation of the electrical equipment at the Hickon substation. Public safety is compromised if the control equipment is not functional. System damage can occur due to system disturbances. If a fault occurs on a line and the protection equipment fails to clear the fault, the line could potentially burn down causing a public hazard. Nonfunctional protective control equipment can also result in excessive and longer interruptions to customers. PPL cannot place a line in service without the proper relay protection. PPL St. 12, at 8–9." (ALJ's January 30, 2009 decision at 9.)

7. Other objectors included SEPTA, Liberty Home Development Corporation, Madden

and site views were conducted for the "Cross Country Corridor," the "Route 309 Corridor," the "SEPTA Corridor" and the Hickon Road substation site. After four public hearings before an administrative law judge (ALJ) with more than 60 witnesses discussing, among other issues,[8] the environmental impact of PPL's choice of the PPL Functional Configuration rather than the Springfield Functional Configuration, the ALJ made a recommended decision to the Commission that PPL's application be approved.

The ALJ found that there was no dispute that PPL required additional transformer capacity in the southern Lehigh Region, and that PPL's evidence was most persuasive that the cost of the PPL Functional Configuration at $51 million over 20 years would be less than the Springfield Functional Configuration at $66 million over that same time period. The ALJ was not swayed by the Township's argument that the Springfield Functional Configuration would not have an adverse environmental impact.[9] The ALJ also found in favor of PPL's route choice for the PPL Functional Configuration. The Township filed exceptions to the ALJ's decision, essentially arguing for the denial of the application and insisting that the rejected "Springfield Functional Configuration" would meet PPL's planning criteria without adverse environmental impact.

Farm Trust, Senator Robert Wonderling and numerous property owners. The primary concern of the Township was that PPL had not evaluated the environmental impacts of the three routes, and the proposed HV transmission line would negatively and unnecessarily impact pristine woodlands in the high quality Tohickon Creek watershed in its Resource Protection District. Additionally, it contended that PPL did not conduct any field investigation of either the Route 309 or SEPTA alternate routes but chose the route that was the most harmful to the environment. The Township also filed a preliminary objection that the substation was not in the public's welfare as required by its zoning ordinance. In response, PPL filed a petition for a finding that the building housing the control equipment at the proposed substation was reasonably necessary for the convenience or welfare of the public and exempt from any local zoning ordinance.

8. The discussions were also regarding the Cross Country Corridor instead of the Route 309 Corridor and the SEPTA Corridor.

9. The ALJ stated:

> What is problematic about the allegation of Springfield is that it states that the entire case of PPL is flawed because the environmental impacts were not considered regarding the Springfield functional configuration but does not show any regulation, statute or case precedent where

it is affirmatively stated that such an analysis is required.

As PPL points out in its Reply Brief, the regulations in 52 Pa.Code Chapter 57, subchapter G, focus on the proposed HV line. PPL R.B. at 8–9. Only 52 Pa.Code § 57.75(4) does not include the phrase "proposed HV line" for evidence to be considered by the Commission. While it is noted that the listed items are not exclusive, consideration of the listed items are in relation to the proposed HV line with the exception of Section 57.75(4). Springfield Functional Configuration is not the proposed HV line. Moreover, Springfield Functional Configuration was not the proposed configuration for the proposed HV line. It was rejected. The Springfield Functional Configuration is to be examined in light of guidance to consider evidence which does not focus on the proposed HV line. The regulation at Section 57.75(e)(4), as stated above, guides consideration of the evidence that is not concerning the proposed HV line. 52 Pa.Code § 57.75(e)(4). When employing Section 57.75(e)(4) the case law suggests that the three part test be used to examine the totality of the circumstances presented as record evidence is to be considered and not to focus solely on the environment. (*See, Payne v. Kassab*, 11 Pa.Cmwlth. 14, 312 A.2d 86 (1973) above at V.B. 3.a.)

(ALJ's January 30, 2009 recommended decision at 104.)

■ The Commission denied the Township's exceptions. It first noted that the Township's interpretation of 52 Pa.Code § 57.76(a)(4) [10] was too restrictive, and the Township understated the adverse effects of the Springfield Functional Configuration. Citing to PPL's reply brief, the Commission stated that it agreed with the following:

> In relying on the PUC's regulations at 52 Pa.Code § 57.76(a)(4), Springfield overlooks the portions of that regulation that incorporate considerations other than the environment. The regulation also considers the "electric power needs of the public" and the "available alternatives." As explained below, the Springfield Functional Configuration would be far inferior to the PPL Electric Functional configuration in meeting the electric power needs of the public and therefore is not a realistic alternative. Further, although cost is not mentioned in Section 57.76(a)(4), it is certainly a valid consideration in transmission line siting, and the Springfield Functional Configuration would cost substantially more than the PPL Electric Functional Configuration. PPL Reply Exc at 6–7.

(Commission's July 24, 2009 decision at 31.) As for the specific steps taken to protect the environment, the Commission stated that PPL had committed to taking substantial steps to mitigate any adverse effects. Specifically, PPL had agreed to the numerous mitigation measures including, but not limited to, taking reasonable steps to minimize disturbances of woodlands and wetlands; considering requests and suggestions from local government entities including Springfield Township, and to comply with reasonable requests; replace disturbed wetlands to the extent that such replacement is required by the Department of Environmental Protection (DEP); and not removing vegetation in rights-of-way except non-compatible vegetation that has the potential to grow more than 20 feet above the ground and where it is necessary to clear vegetation for temporary access roads that are only 15 feet in width. Because the Commission also determined that PPL's application had complied with the Commission's HV transmission line regulation, the Commission adopted the ALJ's recommended decision and granted PPL's application. The Township then filed this petition for review with our Court, and PPL intervened in the appeal.[11]

### III.

■ On appeal, the Township's primary argument is that the Commission was obli-

---

10. 52 Pa.Code § 57.76 provides:

(a) The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. The Commission will not grant the application, either as proposed or as modified, unless it finds and determines as to the proposed HV line:

(1) That there is a need for it.

(2) That it will not create an unreasonable risk of danger to the health and safety of the public.

(3) That is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.

(4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

11. Our standard of review of a Commission order is limited to determining whether there was a constitutional violation, an error of law or a violation of Commission procedure. We also must determine whether the Commission's findings are supported by substantial evidence. *Rohrbaugh v. Pennsylvania Public Utility Commission*, 556 Pa. 199, 727 A.2d 1080 (1999).

148

gated to address environmental impacts of other configurations even if they were rejected, which, in this case, included the environmental impact of the Springfield Functional Configuration, before it decided on a power line route. We disagree because there are no regulations that provide for such a requirement by the Commission.

All of the regulations dealing with review of siting and construction of electric transmission lines are clear when they speak in terms of *proposed routes* or when they speak in terms of *proposed lines,* i.e., *proposed configurations.* As discussed earlier, "routes" are different than "configurations" because "a functional configuration is simply an electrical solution; it does not identify or evaluate the project location or *alternative routes* for the associated transmission lines." (PPL's brief at 13.) Routes are the way the HV transmission lines implement the selected functional configuration. None of the regulations dealing with HV transmission line applications require the Commission to consider alternative configurations as the Township contends.

Beginning with 52 Pa.Code § 57.72(c), dealing with the form and content of the application, the following subsections delineate what is of interest to the Commission when reviewing an application for a proposed HV transmission line:

(c) An application shall contain:

\* \* \*

(3) A general description—not a legal or metes and bound description—of *the proposed route* of the HV line, to include the number of route miles, the right-of-way width and the location of the proposed HV line within each city, borough, town and township traversed.

\* \* \*

(5) A general statement of the need for *the proposed HV line* in meeting

identified present and future demands for service, of how *the proposed HV line* will meet that need and of the engineering justifications for *the proposed HV line.*

\* \* \*

(7) A description of studies which had been made as to the projected environmental impact of *the HV line as proposed* and of the efforts which have been and which will be made to minimize the impact of *the HV line* upon the environment and upon scenic and historic areas, including but not limited to impacts, where applicable, upon land use, soil and sedimentation, plant and wildlife habitats, terrain, hydrology and landscape.

\* \* \*

(10) A general description of reasonable alternative routes [i.e., corridors] to *the proposed HV line,* including a description of the corridor planning methodology, a comparison of the merits and detriments of each route, and a statement of the reasons for selecting the *proposed HV line route.*

(Emphasis added.) Contrary to the Township's contention that the Commission is required to consider alternative configurations, nowhere in this regulation is there a requirement that the Commission consider anything but the **proposed HV line.**

52 Pa.Code § 57.75(a) provides that the Commission will set the time and place for hearing or hearings of the application after providing notice of a hearing in a newspaper within each municipality in which "the HV line is proposed to be located." Under 52 Pa.Code § 57.75(e), the Commission will accept evidence and will consider its application based, *inter alia,* on the following matters:

1. The present and future necessity of *the proposed HV line* in furnishing service to the public.

2. The safety of *the proposed HV line.*

3. The impact and the efforts which have been and will be made to minimize the impact, if any, of *the proposed HV line* upon the following:

(i) Land use.

(ii) Soil and sedimentation.

(iii) Plant and wildlife habitats.

(iv) Terrain.

(v) Hydrology.

(vi) Landscape.

(vii) Archeologic areas.

(viii) Geologic areas.

(ix) Historic areas.

(x) Scenic areas.

(xi) Wilderness areas.

(xii) Scenic rivers.

4. The availability of *reasonable alternative routes.*

(Emphasis added.) Again, nothing in this regulation requires the Commission to consider evidence of an alternative configuration, but only **reasonable alternative routes.**

Finally, after the hearing, 52 Pa.Code § 57.76(a)(4) provides:

(a) The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. The Commission will not grant the application, either as proposed or as modified, unless it finds and determines as to *the proposed HV line:*

(1) That there is a need for it.

(2) That it will not create an unreasonable risk of danger to the health and safety of the public.

(3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.

(4) *That it will have minimum adverse environmental impact,* considering the electric power needs of the public, the state of available technology and the available alternatives.

(Emphasis added.)

The Township contends that when the Commission adopted 52 Pa.Code § 57.76(a)(4), a utility had a special burden to show that it had minimized the environmental impacts of a proposed transmission line. However, the Township argues that the Commission did not follow this regulation because PPL's expert testified that there would be severe environmental impacts from whichever "route" that was chosen to implement the PPL Functional Configuration. It argues that the Springfield Functional Configuration would have maximized the use of PPL's existing facilities in the region while constructing only three of four miles of new transmission line in the region by the year 2020. It also would not have required the construction of a new substation and, based on the Township's expert's testimony, the impact on the environment would have been insignificant.

What the Township ignores in making its argument is that 52 Pa.Code § 57.76(a)(4) only requires that the Commission make a determination as to the *proposed line,* not to the other configurations that were considered and rejected as is the case here. Even if PPL's expert testified that there would be environmental impacts from whichever route that was chosen to implement the PPL Functional Configuration, that is irrelevant to support the Township's argument that its Springfield Functional Configuration should have been chosen. To summarize, the Commission's siting regulations apply to and require the satisfaction of criteria related to

the *"proposed HV line"* and the *alternate routes* for the high voltage transmission line. No requirements exist to rejected functional configurations.

Here, the Commission evaluated the proposed PPL Functional Configuration and found that it was necessary to meet the growing demands for electricity of the public in the southern Lehigh Valley region. Specifically, it determined that PPL preferred it over the Springfield Functional Configuration because it crossed the Hickon substation site which was previously purchased by PPL and did not require additional transmission lines to connect the Hickon substation to the regional electrical transmission grid. On the other hand, the Springfield Functional Configuration would not provide the same degree of load transfers, would require longer lines and had significant limitations for future expansion that did not exist with the PPL Functional Configuration. In addition, the Springfield Functional Configuration would have substantial social impacts. It would require the construction of two new transmission lines where there were none, and those lines would not traverse any critical plant or animal habitat areas because they would cross substantially developed, densely populated areas, thereby impacting numerous homes. As PPL explained:

> Much of the opposing testimony in this case is critical of PPL Electric's decision to site the proposed transmission line in more open, less developed areas, as opposed to areas that are already devel-

oped. Unfortunately, this was simply not feasible in this case. PPL Electric must deliver electricity to where it is needed which is generally in more developed residential areas. However, PPL Electric, by law, cannot build a transmission line within 100 meters of any residence unless the owner agrees. This by definition virtually precludes siting transmission lines and substations in developed residential areas. The only alternative is to locate the lines in more open, less developed areas. Much of the testimony in this case, however, criticizes PPL Electric for siting the line in these more open areas, citing environmental and other concerns. If adopted, this approach would leave PPL Electric with no suitable location for new transmission lines and no way to provide reliable service to customers.

(*See* Appendix A of PPL's brief, PPL Stmt. No. 2–R, p. 8.) Consequently, the new transmission lines associated with the Springfield Functional Configuration would have had substantial social impacts due to their proximity to the densely populated areas.

Because PPL was only required to present to the Commission an application for a *proposed line* and *alternate routes* and not a rejected configuration, and the Commission determined that the proposed PPL Functional Configuration met its regulations, this Court will not substitute its discretion for the discretion properly exercised by the Commission. *Rohrbaugh.*[12]

12. The Township also argues that the Commission had an obligation under Art. I, § 27 of the Pennsylvania Constitution to consider the alternative option. Art. I, § 27 provides:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common

property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Citing *Payne v. Kassab*, 11 Pa.Cmwlth. 14, 312 A.2d 86, 94 (1973), the Township points out that this Court held that an administrative

Consequently, because the Commission properly followed its own regulations, it did not err in granting PPL a certificate of public convenience.

Accordingly, the Commission's decision is affirmed.

Judge BUTLER dissents.

### ORDER

AND NOW, this 13th day of January, 2012, the order of the Pennsylvania Public Utility Commission, dated July 24, 2009, is affirmed.

### DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. Article I, Section 27, of the Pennsylvania Constitution [1] commands the Commonwealth's government to preserve Pennsylvania's natural, scenic and historic resources.[2] To implement that constitutional directive, the Public Utility Commission (Commission) has adopted a binding regulation to place an "intensified burden" upon public utilities to justify the environmental degradation presented by the construction of any new high voltage (HV) electric transmission line. In this case, the Commission has reduced this intense burden to little more than a speed bump, thereby abusing its discretion.

At issue here is a certificate of public convenience sought by PPL Electric Utility Corporation (PPL) for a new seven-mile HV electric transmission line that will cut a 100–foot wide corridor through a pristine

---

agency's compliance with Art. 1, § 27 was determined by using a three-part test:

> (1) Was the compliance with all applicable statutes and regulations for the protection of the Commonwealth's public natural resources?
> (2) Did the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum?
> (3) Did the resulting environmental harm clearly outweigh the benefits to be derived that to proceed further would be an abuse of discretion?

However, the Township has not argued in its petition for review or its brief that the Commission's siting regulations are invalid and fail to comply with the requirements set forth in the *Payne* test or that the *Payne* test fails to satisfy the criteria set forth in Art. I, § 27. Therefore, the Township cannot argue that PPL was obligated under Art. I, § 27 to conduct an environmental analysis before rejecting the Springfield Functional Configuration.

1. Article I, Section 27 of the Pennsylvania Constitution states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

2. In *Payne v. Kassab*, 468 Pa. 226, 245, 361 A.2d 263, 272 (1976), our Supreme Court stated:

> There can be no question that [Article I, Section 27, of the Pennsylvania Constitution] itself declares and creates a public trust of public natural resources for the benefit of all the people (including future generations as yet unborn) and that the Commonwealth is made the trustee of said resources, commanded to conserve and maintain them.

woodland preserve enhanced by a high-quality stream that is home to a number of cold water fish species. PPL's certificate application explained that this environmental intrusion was necessary to meet the future electric service needs in the southern part of the Lehigh Valley. PPL reached this conclusion by using a planning process that was supposed to assure the public that it will "supply electricity to all customer loads in a reliable, economic and *environmentally acceptable manner.*" Reproduced Record at 21a (R.R. ———) (emphasis added). Springfield Township challenges the conclusion that there is anything environmentally acceptable about PPL's proposal.

PPL's planning process began with an identification of the many variables to electric transmission and then used computer simulations to produce an "economic and environmentally acceptable" plan. R.R. 23a. The modeling produced two engineering solutions: the Springfield Functional Configuration and the PPL Functional Configuration.[3] PPL chose the PPL Functional Configuration because it was projected to cost $5 million less, a point contested by the litigants. PPL did not compare the relative environmental merits of the two configurations, even though each plan had equal potential to solve the

electric service issues that prompted the project.

The Administrative Law Judge found, as fact, that PPL did not consider the environmental impact of the Springfield Functional Configuration even while acknowledging that a "more detailed analysis of environmental and land use assessment" would have been appropriate. R.R. 583a. The ALJ neither agreed nor disagreed with Springfield Township's expert that the regional reliability issue could be addressed by the Springfield Functional Configuration and without the need to construct a new substation and HV electric transmission line. Nor did the ALJ consider the evidence that with minor modifications, the Springfield Functional Configuration would be less costly than the PPL Functional Configuration.[4] This evidence was admitted as probative and relevant, but it was then ignored by the ALJ and by the Commission.

The regulation states that the Commission "will not" grant a certificate of public convenience for a new HV electric transmission line unless and until

> *it finds* and determines [that] *the proposed HV line . . . will have minimum adverse environmental impact,* considering the electric power needs of the public, the state of available technology and *the available alternatives.*

3. In its application, PPL refers to the PPL Functional Configuration as "Alternative 1" and the Springfield Functional Configuration as "Alternative 2." *See* R.R. 29a–35a.

4. Springfield Township's engineering expert, Peter Lanzalotta, agreed that PPL needs to reinforce its service in southern Lehigh County by 2014. He opined, however, that PPL could quadruple its transformer capacity at existing substations, which would eliminate the need for a new substation. He explained that this would create "considerably more expansion capacity . . . than PPL would need by 2014 or for many years thereafter." R.R.

211a. Lanzalotta testified that the Springfield Functional Configuration could use existing substations and HV transmission lines, thereby eliminating the need for any new construction or adverse impact on the environment. By reconductoring existing lines, PPL could more than double their current capacity and significantly reduce the cost of the Springfield Functional Configuration. Finally, Lanzalotta disputed PPL's claim that a centralized substation is needed, noting that PPL provided no data to show that customer service interruptions are a problem in the region or that service operations are affected by the length of a transmission line.

52 Pa.Code § 57.76(a)(4) (emphasis added).[5] The Commission considered three alternate routes for the PPL Functional Configuration, but that does not end its mandatory inquiry.[6] The Commission then had to go the final step of finding that the proposed HV electric transmission line in the PPL Functional Configuration would have a "minimum adverse environmental impact ..." given the "available alternative" of the Springfield Functional Configuration. 52 Pa.Code § 57.76(a)(4). We know this from the text of the regulation and from the Commission's own published explanations of the regulation's purpose.

When the Commission proposed the regulation in 1976, it explained that the regulation was needed because, traditionally, study of a proposed HV line's "environmental impact [was] limited in scope to the property to be condemned or to the service territory to be traversed." *Re: Proposed Electric Regulation,* 1976 Pa. PUC Lexis 114 (March 2, 1976), at *2. The Commission expressed concern that such limited "review occurs too late" because

> [i]n many cases, the application for certification is not filed until a final route has been selected, most of the needed rights-of-way have been purchased, and some construction begun ... [thus] creat[ing] substantial restraints with respect to modifying the location and construction of the proposed line.

*Id.* at *2–*3. The new regulation would remedy this problem by providing oversight "at a sufficiently early stage in the development of new transmission facilities so that the Commission, the public, and interested parties can participate in an effective review." *Id.* The Commission promised that its regulation would "ensure

---

5. Section 57.76(a) states:
   (a) The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. The *Commission will not grant the application, either as proposed or as modified, unless it finds and determines as to the proposed HV line:*
   (1) That there is a need for it.
   (2) That it will not create an unreasonable risk of danger to the health and safety of the public.
   (3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.
   (4) *That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.*
   52 Pa.Code § 57.76(a) (emphasis added).
6. The regulation identifies what evidence the Commission will consider in making its determination:

(e) At hearings held under this section, *the Commission will accept evidence upon, and in its determination of the application it will consider, inter alia, the following matters:*
   (1) The present and future necessity of the proposed HV line in furnishing service to the public.
   (2) The safety of the proposed HV line.
   (3) The impact and the efforts which have been and will be made to minimize the impact, if any, of the proposed HV line upon the following:
      (i) Land use.
      (ii) Soil and sedimentation.
      (iii) Plant and wildlife habitats.
      (iv) Terrain.
      (v) Hydrology.
      (vi) Landscape.
      (vii) Archeologic areas.
      (viii) Geologic areas.
      (ix) Historic areas.
      (x) Scenic areas.
      (xi) Wilderness areas.
      (xii) Scenic rivers.
   (4) *The availability of reasonable alternative routes.*
52 Pa.Code § 57.75(e) (emphasis added).

that [any new HV line] will have the *least possible adverse impact on the environment* and will present the least possible danger to public health and safety." *Id.* (emphasis added). In its order adopting the regulation, the Commission explained it intended the regulation to burden the utility with showing "*on the record* that the environment has been considered in its planning" for any new HV transmission line. 8 Pa. Bull. 1405 (1978) (emphasis added).[7]

None of these promises have been fulfilled here. To be sure, PPL presented evidence on three alternate routes: the Cross Country Route, the Route 309 Line, and the SEPTA Line. The Cross Country Route was estimated to cost $13 million; the Route 309 line $25 million; and the SEPTA Line $31 million. PPL simply stacked the deck in favor of the route it actually wanted and in which it had already invested. By the time it submitted its application, PPL was well past the planning stages. It had purchased one property and removed the home (R.R. 107a); purchased 85 acres for its proposed substation (R.R. 88a); negotiated rights-of-way with property owners along the Cross Country Route (R.R. 17a); and worked with Tumblebrook Municipal Golf Course to run the new HV electric transmission line across its property (R.R. 15a). However, none of these implementing steps were to be taken in advance of the

Commission's review. *Re: Proposed Electric Regulation,* 1976 Pa. PUC Lexis 114 (March 2, 1976), at *2. In sum, the Commission has reverted to its pre-regulation days when it examined only "the property to be condemned or ... the service territory to be traversed." *Id.*

To rationalize its decision not to evaluate the environmental impact of the Springfield Functional Configuration, the Commission explains that the focus of Section 57.76 is on the siting of the proposed HV electric transmission line, not its alternatives.[8] PPL chimes in that "available alternatives" means "alternative routes" and that any other interpretation will place an impossible burden on the utility. These arguments cannot be reconciled with the text and stated purpose of the regulation.

First, "available alternative," as used in Section 57.76(a)(4), is not synonymous with "alternate route," as used in Section 57.75(e). Indeed, "alternative route" is a defined term:

> *Alternate route or alternative route*—A reasonable right-of-way which includes not more than 25% of the right-of-way of the applicant's proposed route.

52 Pa.Code § 57.1. The drafters found it necessary to explain that "alternate" and "alternative" were synonymous when used as adjectives modifying the noun "route." Notwithstanding this high degree of word sensitivity, the drafters did not sweep

---

7. In more detail, the Commission stated that its regulation expressed the Commission's

> notice of the fact that overhead electric transmission lines cannot be constructed without some adverse effect upon the environment.
> This means that under Pennsylvania law every applicant for a siting certificate has an *intensified burden to show on the record that the environment has been considered in its planning and that every reasonable effort*

> *has been made to reduce the environmental incursion to a minimum.*
> 8 Pa. Bull. 1405 (1978) (emphasis added).

8. The regulation sets the substantive standards for the grant of a certificate of public convenience for construction of an HV electric transmission line. 52 Pa.Code § 57.76(a). The standards for approval speak to the need for the HV electric transmission line and protection of the environment; those standards say nothing about the location for the line.

"available alternative" into this definition. Their decision must be presumed intentional. In mandating that an HV line have a "minimum adverse environmental impact, considering ... the *available alternatives*," the word "alternatives" means something other than "alternate routes." 52 Pa.Code § 57.76(a)(4). By reading "alternative," the noun, as identical to "alternative route," the Commission is adding words to its regulation. This is error. *Guinn v. Alburtis Fire Company*, 531 Pa. 500, 503 n. 4, 614 A.2d 218, 220 n. 4 (1992) (words cannot be added to legislation).

Second, the Commission's present construction of "alternative" in Section 57.76(a)(4) gives utilities an easy, and somewhat perverse, path around the regulation's command. The utility can choose a route on any grounds, such as a desire to use land purchased from a board member. The utility can then justify any degree of environmental degradation presented by that choice simply by offering more noxious, or even silly, "alternative routes."

Third, the Commission cannot find that a utility's proposed HV electric transmission line will have "minimum adverse environmental impact" without considering the "available technology" and "available alternative." That alternative might eliminate the need for a new HV electric transmission line with a totally different technological alternative. This explains why the word "route" does not appear in 52 Pa. Code § 57.76(a)(4).

PPL argues that any other reading of "available alternatives" will require it to consider every possible alternative. This is a not very convincing bogeyman. As this Court held in *O'Connor v. Pennsylvania Public Utility Commission*, 136 Pa. Cmwlth. 119, 582 A.2d 427, 433 (1990), a utility is required only to "show that it has made a reasonable decision, not the best possible decision." PPL rejected the Springfield Functional Configuration on grounds of cost and greater flexibility of the PPL Functional Configuration. By its own admission, PPL did not factor environmental impact into that evaluation. In the absence of that consideration, PPL cannot show that its proposed solution was a reasonable one. Accordingly, the Commission failed in its duty to avoid, where feasible, an adverse environmental impact. *See Payne v. Kassab*, 468 Pa. 226, 245–47, 361 A.2d 263, 272–73 (1976) (holding that Article I, Section 27 of the Pennsylvania Constitution requires agencies to prevent environmental harm where feasible and, if not feasible, to keep the harm to a minimum). In the absence of any environmental evaluation of the Springfield Functional Configuration, PPL did not prove that the construction of a 100–foot corridor through the Springfield Resource Protection District and deforestation of 44 acres of land was an unavoidable insult to the environment.[9]

The Commission has allowed its HV electric transmission line regulation to devolve into the worst kind of regulation. It creates busywork for corporate and government bureaucrats; billable hours for consultants and lawyers; and the illusion of environmental protection. In the end, however, the regulation does not advance the substantive goal of preserving

Pennsylvania's public natural resources [that] are the common property of all

---

9. The Commission notes the steps that PPL has taken to mitigate the environmental impact of the PPL Functional Configuration. These steps, however, address Section 57.76(a)(3), *i.e.*, whether the proposed HV electric transmission line "is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth." 52 Pa.Code § 57.76(a)(3).

the people, including generations yet to come.

Pa. Const. Art. I, § 27.

The Commission erred and abused its discretion in finding that PPL's proposed HV electric transmission line will have a minimum adverse environmental impact because it failed to follow the mandate of its regulation that it consider the available alternative. I would reverse and remand for the Commission to evaluate the environmental impact of the Springfield Configuration.