# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wayne K. Baker,                              :
               Petitioner       :
                                 :
                                 :
        v.                              :  No. 633 C.D. 2016
                                 :  Argued:  October 17, 2016
Department of Environmental          :
Protection,                                  :
               Respondent    :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE JOSEPH M. COSGROVE, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge

## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER                        FILED:  March 2, 2017

Wayne K. Baker (Petitioner) appeals from an Order of the Environmental Hearing Board (EHB) dismissing his appeal of the Department of Environmental Protection's (DEP) approval of a Stage 1 bond release to Amerikohl Mining, Inc. (Amerikohl) related to surface mining of coal on Petitioner's property (Site).  This appeal addresses two requirements of the Stage 1 bond release:  (1) that all waste and materials associated with the mining operation be removed from the mining site; and (2) that the mining site is returned to its approximate original contours (AOC).  Petitioner argues that the EHB erred by improperly placing the burden

upon him to prove that Amerikohl met a heightened standard for the first requirement, and by concluding that both requirements were met. We affirm.

Government efforts related to the conservation and improvement of lands impacted by surface mining of coal are governed primarily by the Surface Mining Conservation and Reclamation Act[1] (SMCRA). Section 1 of SMCRA sets forth its purpose and provides:

> This act shall be deemed to be an exercise of the police powers of the Commonwealth for the general welfare of the people of the Commonwealth, by providing for the conservation and improvement of areas of land affected in the surface mining of bituminous and anthracite coal and metallic and nonmetallic minerals, to aid thereby in the protection of birds and wild life, to enhance the value of such land for taxation, to decrease soil erosion, to aid in the prevention of the pollution of rivers and streams, to protect and maintain water supply, to protect land and to enhance land use management and planning, to prevent and eliminate hazards to health and safety, to promote and provide incentives for the remining of previously affected areas, to allow for government-financed reclamation contracts authorizing incidental and necessary coal extraction, to authorize a remining and reclamation incentive program, to prevent combustion of unmined coal, and generally to improve the use and enjoyment of said lands, to designate lands unsuitable for mining and to maintain primary jurisdiction over surface coal mining in Pennsylvania. It is also the policy of this act to assure that the coal supply essential to the Nation's and the Commonwealth's energy requirements, and to their economic and social well-being, is provided and to strike a balance between protection of the environment and agricultural productivity and the Nation's and the Commonwealth's need for coal as an essential source of energy.

52 P.S. § 1396.1.

In order to effectuate its purpose, Section 4(a) of SMCRA requires mine operators to obtain a permit from DEP prior to any surface mining of coal. 52 P.S.

---

[1] Act of May 31, 1945, P.L. 1198, as amended, 52 P.S. §§ 1396.1 - 1406.

2

§ 1396.4(a). In conjunction with the permit, Section 4(d) of SMCRA requires mine operators to put up a bond to cover the costs of any reclamation. Section 4(d) of SMCRA provides, in relevant part:

> Prior to commencing surface mining, the permittee shall file with [DEP] a bond for the land affected by each operation on a form to be prescribed and furnished by [DEP], payable to the Commonwealth and conditioned that the permittee shall faithfully perform all of the requirements of this act and . . . "The Clean Streams Law,[2]" [and other acts not relevant here] . . . . The amount of the bond required shall be in an amount determined by [DEP] based upon the total estimated cost to the Commonwealth of completing the approved reclamation plan, or in such other amount and form as may be established by [DEP] pursuant to regulations for an alternate coal bonding program which shall achieve the objectives and purposes of the bonding program.

52 P.S. § 1396.4(d).

In addition to requiring mine operators to return the land to a productive and/or environmentally sustainable state, SMCRA and DEP's associated regulations address the restoration of the mine site's topography. Section 4(a)(2)(E) of SMCRA, 52 P.S. § 1396.4(a)(2)(E). Pursuant to DEP's regulations, areas disturbed by mining operations "shall be returned to their approximate original contour . . . ." 25 Pa. Code § 87.141(a). Section 3 of SMCRA defines "contour[]" as that which "closely resembles the general surface configuration of the land prior to mining and blends into and complements the drainage pattern of the surrounding terrain with no highwall, spoil piles[,] or depressions to accumulate water and with adequate provision for drainage." 52 P.S. § 1396.3.

---

[2] Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. §§ 691.1 - 691.1001.

3

As a general matter, SMCRA addresses the impact mining operations have on *the land*. The Clean Streams Law, on the other hand, imposes requirements on surface coal mining operations with regard to the impact the mining operations have on *the waters* of the Commonwealth.[3] Section 315(b) of the Clean Streams Law provides in relevant part:

> [DEP] may require an applicant for a permit to operate a mine, or a permittee holding a permit to operate a mine under the provisions of this section, to post a bond or bonds on forms prescribed and furnished by [DEP] in favor of the Commonwealth of Pennsylvania and with good and sufficient collateral, irrevocable bank letters of credit or corporate surety guarantees acceptable to [DEP] to insure that there will be compliance with the law, the rules and regulations of [DEP], and the provisions and conditions of such permit including but not limited to conditions pertaining to restoration measures or other provisions insuring that there will be no polluting discharge after mining operations have ceased. [DEP] shall establish the amount of the bond required for each operation based on the cost to the Commonwealth of taking corrective measures in cases of the

---

[3] In enacting the Clean Streams Law, the General Assembly stated its objective in Section 4 as follows:

(1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;

(2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;

(3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;

(4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

(5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control.

35 P.S. § 691.4. Added by Section 2 of the Act of August 23, 1965, P.L. 372, as amended.

operator's failure to comply, or in such other amount and form as may be established by [DEP] pursuant to regulations for an alternate coal bonding program which shall achieve the objectives and purposes of the bonding program. . . . *Upon the completion of any mining operation and prior to the release by [DEP] of any portion of the bond liability, the operator shall remove and clean up all temporary materials, property, debris or junk which were used in or resulted from his mining operations.* . . . If the operator fails or refuses to comply with the requirements of the act in any respect for which liability has been charged on the bond, the Secretary of [DEP] shall declare the bond forfeited, and shall certify the same to the Attorney General, who shall proceed to enforce and collect the amount of liability forfeited thereon, and where the operator has deposited cash or securities as collateral in lieu of a corporate surety, the secretary shall declare said collateral forfeited. If the operator is or was engaged in surface mining operations at the time of the violation, the secretary shall direct the State Treasurer to pay said funds into the Surface Mining Conservation and Reclamation Fund, or to proceed to sell said securities to the extent forfeited and pay the proceeds thereof into the Surface Mining Conservation and Reclamation Fund.

35 P.S. § 691.315(b)[4] (emphasis added). The requirements of SMCRA and the Clean Streams Law are to be read as complementary measures protecting the land and waters of the Commonwealth, respectively.

Mine operators must apply to DEP for a bond release and give public notice in a newspaper of general circulation that it has applied for such. Sections 4(b) and 4(g) of SMCRA, 52 P.S. §§ 1396.4(b), (g). The bonds are released by DEP in three stages. See Section 4(g) of SMCRA, 52 P.S. § 1396.4(g) (detailing the three stages); 25 Pa. Code § 86.174 (same). Stage 1 involves the "[r]elease of an amount not to exceed 60% of the total bond amount[,]" 25 Pa. Code § 86.175, and is met when the permit area *"has been backfilled and regraded to the approximate original contour* or approved alternative, and when drainage controls have been

---

[4] Added by Section 5 of the Act of August 23, 1965, P.L. 372, as amended.

5

installed in accordance with the approved reclamation plan," 25 Pa. Code § 86.174 (emphasis added).

DEP may release all or a portion of the bond if it "is satisfied the reclamation covered by the bond or portion thereof has been accomplished." 52 P.S. § 1396.4(g). DEP's review of an application for a bond release is detailed in Section 86.171(f) of DEP's regulations, which provides in relevant part:

> (f) Departmental review and decision will be as follows:
>     (1) [DEP] will consider during inspection, evaluation, hearing and decision:
>
>> (i) Whether the permittee has met the criteria for release of the bond [discussed above related to the schedule of release for each stage].
>>
>> (ii) Whether the permittee has satisfactorily completed the requirements of the reclamation plan, or relevant portion thereof, and complied with the requirements of the acts, regulations thereunder and the conditions of the permit, and the degree of difficulty in completing remaining reclamation, restoration or abatement work.
>>
>> (iii) Whether pollution of surface and subsurface water is occurring, the probability of future pollution or the continuance of present pollution, and the estimated cost of abating pollution.

25 Pa. Code § 86.171(f).

## I.   DEP'S DECISION

The Site is in Fayette County, Pennsylvania. (EHB Decision, Findings of Fact (FOF) ¶ 4.) Amerikohl conducted surface mining activities at the Site pursuant to a surface mining permit issued in 2011 and posted a bond of $141,520. (Id. ¶¶ 4, 9.) No party conducted a pre-mining survey of the Property, but the

6

permit states that no pre-mining slope exceeded 8.5 degrees. (Id. ¶¶ 14, 15.) Upon the completion of active mining, Amerikohl submitted a request to DEP on July 23, 2014, for a Stage 1 release of 60% of the total bond, or $77,659. (Id. ¶ 10.)

Petitioner was concerned with apparent changes to the Site's topography after the completion of the mining operation and hired William G. Rosner, a professional surveyor with 50 years of experience in the mining industry, to survey the Site. (Id. ¶¶ 16-17.) Mr. Rosner took measurements of the Site using an Abney level, a handheld device used to measure slopes. (Id. ¶ 18.) While his results showed that most of the site was returned to approximate original contour, one slope on the Site measured 22.6 degrees. (Id. ¶¶ 18, 20.) The slope at issue was "upslope from a portion of the collection ditch at the perimeter of the site on the northern portion of the mine site." (Id. ¶ 19.)

Matthew Somogyi was the assigned DEP Surface Mining Conservation Inspector of the Site from the beginning of the mining operations. (Hr'g Tr. at 445, R.R. at 337a.) Mr. Somogyi took photographs of the Site on July 11, 2014, shortly after mining operations were completed and the Site was backfilled, regraded, seeded, and mulched. (Hr'g Tr. at 450, R.R. at 338a.) DEP also sent Mr. Pytash, Mr. Somogyi's supervisor, to meet with Petitioner to informally discuss his concerns. (Hr'g Tr. at 475-76, R.R. at 344a-45a.) When Mr. Pytash retired, William Shuss, a Mine Conservation Inspector Supervisor with DEP, assumed Mr. Pytash's responsibilities. (Id.)

Mr. Shuss visually inspected the Site for compliance with the slope requirements and concluded that the site blended well with the surrounding topography. (FOF ¶¶ 29-30.) Mr. Shuss' typical process is to visually assess whether a mining site has been "re-graded in a manner consistent with the

7

regulations." (Hr'g Tr. at 479, R.R. at 345a.) Mr. Shuss will take measurements or ask the mine operator to do so if the site looks like it violates the regulation when he assesses it with the naked eye. (FOF ¶ 29; Hr'g Tr. at 480, R.R. at 346a.) Mr. Shuss observed that the collection ditch, which he saw as a temporary water control measure, caused a depression in the property and relayed to Amerikohl that the ditch had to be regraded. (Hr'g Tr. at 486-87, R.R. at 347a.) However, he did not think that the collection ditch should be fixed at that time due to the possible impact on the newly planted vegetation. (Id.) Mr. Shuss thought that the best approach was to fill the collection ditch once the vegetation further matured. (Id.)

After hearing Petitioner's concerns, Mr. Shuss asked Amerikohl to survey the Site. (Hr'g Tr. at 493, R.R. at 349a.) Amerikohl contracted with Earth Tech to conduct a study, which was submitted in July of 2014. (Hr'g Tr. at 651, 653, R.R. at 420-21a.) Charles Lightfoot of Earth Tech oversaw the project. (FOF ¶ 35.) The study concluded that the Site was returned to AOC and that Amerikohl met the reclamation standards. (Hr'g Tr. at 652-53, R.R. at 420a-21a.)

In addition to concerns over the topography, Petitioner objected to the Stage 1 bond release on the grounds that waste was left on the Site. Petitioner testified that he saw a mechanic named Mike Richter drain oil from an excavator on to the ground in March or April 2014 and told Amerikohl's foreman about what he saw. (Hr'g Tr. at 141-45, R.R. at 229a-30a.) Petitioner filed a complaint with the federal Environmental Protection Agency (EPA) in July 2014, shortly before Amerikohl applied for the Stage 1 bond release. The EPA complaint was referred to DEP and received on July 7, 2014. (R.R. at 602a.) An inspector sent to the Site by DEP did not observe any evidence of a spill. (Id.; Hr'g Tr. at 489, R.R. at 348a.)

8

DEP concluded that Amerikohl satisfied the requirements of Stage 1 bond release and approved the release. (FOF ¶ 11.) According to a letter dated September 19, 2014, from Mr. Shuss to Petitioner explaining DEP's decision,

> Your concern that the currently constructed collection ditch and sedimentation pond, previously mentioned on the southern slope will prevent access to the disturbed area of the site was addressed during our site inspection with you and Mr. Rosner. [DEP] will insure that the area near the pond blends with the natural ground and the slope of the site above the ditch after the pond is removed.
>
> Collection ditch C3, a temporary drainage control, is impounding water, at its eastern end because it was installed incorrectly. Amerikohl is to remove this ditch after successful vegetation is established probably in the spring of next year. Remedial work on the ditch is not recommended at this time as it will destroy the vegetation on the slope above the ditch and will lead to increased erosion and loss of topsoil.
>
> Based on the above, [DEP] has granted Stage [1] bond release to Amerikohl Mining Inc. for the subject site.

(R.R. at 23a.) DEP's letter did not address Petitioner's allegations of waste oil dumping.

## II. APPEAL TO EHB

Petitioner appealed DEP's decision to the EHB on October 30, 2014. (R.R. at 9a.) Therein, Petitioner argued: (1) that the Site was not returned to AOC; (2) that waste oil was spilled at the Site and remains in the ground; and (3) that Amerikohl "has failed to bury all acid- and toxic-forming material in accordance with Pennsylvania law and the permit conditions." (R.R. at 10a.)

In anticipation of the EHB adjudication of the matter, Petitioner, Amerikohl, and DEP procured additional evidence, which was presented to the EHB at a

9

hearing that lasted three days. With regard to the Site's topography, Mr. Rosner surveyed the Site a second time on March 11, 2015, this time using "conventional surveying equipment." (FOF ¶ 21.) The conventional survey measurements supported his earlier measurements using the Abney level. (Id. ¶ 22.) The collection ditch was removed on or about April 20, 2015. (Id. ¶ 25; Hr'g Tr. at 487, R.R. at 347a.) After the collection ditch was removed, Mr. Rosner visited the Site on August 21, 2015, and measured the slope at issue as 23 degrees using an Abney level that he rested on his truck. (FOF ¶ 26.)

Earth Tech also returned to the Site on behalf of Amerikohl after the ditch was filled and the area re-graded. (Hr'g Tr. at 657, R.R. at 422a.) Earth Tech estimated pre-mining slopes using PASDA.[5] (FOF ¶ 39.) The EHB considered PASDA mapping as more accurate than other methods, such as United States Geological Survey (USGS), because, *inter alia*, it takes advantage of modern mapping technologies. (Id. ¶ 37.) The Earth Tech survey, conducted with GPS measurements and consistent with the measuring standard articulated in DEP's regulations on pre-mining mapping,[6] showed that the post-mining slopes were less

---

[5] "'PASDA' is the acronym for Pennsylvania Spatial Data Access and, according to its website 'is the official public access geospatial information clearinghouse for the Commonwealth of Pennsylvania.'" (EHB Decision at 14 n.3.)

[6] Section 87.54(21) of DEP's regulations provide:

(21) Sufficient slope measurements to adequately represent the existing land surface configuration of the proposed permit area, measured and recorded according to the following:

(i) Each measurement shall consist of an angle of inclination along the prevailing slope extending 100 linear feet above and below or beyond the coal outcrop or the area to be disturbed, or, when this is impractical, at locations specified by the Department.

**(Footnote continued on next page…)**

10

severe than the pre-mining slopes.  (FOF ¶ 41.)  DEP also photographed the Property on August 6, 2015.  (Id. ¶ 32.)  These photographs "depict gradual slopes and no high[ ]walls, spoil piles or depressions."  (Id.)

With regard to waste on the Site, in an effort to obtain more information on the alleged waste oil dumping, Petitioner, Mr. Rosner, and a representative from American Geosciences (AGI), an environmental consulting firm retained by Petitioner, excavated six test pits where Amerikohl kept its oil and fuel tanks and performed maintenance on its equipment.  (Id. ¶ 47; Hr'g Tr. at 348, R.R. at 313a.)  The excavation unearthed "three oil filters, a fuel/water separator filter, three oily rags and a plastic lid."  (FOF ¶ 48.)  Petitioner removed the items and presented them at the hearing.  (EHB Decision at 17 & n.6.)  No other materials were discovered by Petitioner.

Testimony on possible waste oil dumping on the Site was presented to the EHB by William Parsonage of AGI on behalf of Petitioner.  Mr. Parsonage and his colleague, Brice Rupp, visited the Site in February and April of 2015, respectively.  (Hr'g Tr. at 342, R.R. at 311a.)  Mr. Rupp was present when Petitioner excavated the pits.  (Id.)  Mr. Rupp conducted a test of the pits with a photoionization detector (PID), which is a device that measures concentrations of volatile organic

_____

**(continued…)**

          (ii) The measurements shall extend at least 100 feet beyond the limits of mining disturbances, or another distance determined by the Department to be representative of the premining configuration of the land, when the area has been previously mined.

          (iii) Slope measurement shall take into account natural variations in slope, to provide accurate representation of the range of natural slopes and reflect geomorphic differences of the area to be disturbed.

25 Pa. Code § 87.54(21).

compounds in the air. (Id. at 314a.) The results "ranged from background to one location w[h]ere the reading was 8.5 parts per million" (ppm). (Id.) Mr. Parsonage testified that a reading of 8.5 ppm was significant because waste oils or lubricating oils typically would not produce such high readings. (Id.)

Amerikohl responded to Petitioner's evidence presented by AGI with its expert, James Pinta from Civil and Environmental Consultants. Mr. Pinta reviewed the reports from AGI and witnessed Mr. Parsonage's and Mr. Baker's testimony. (Hr'g Tr. at 574, R.R. at 401a.) He demonstrated to the EHB how a PID reader works and opined as follows.

> [An] 8.5 reading could very well be a background reading. I mean, I put the cap of that Sharpie pen over here and it went up to almost 60, which is almost eight times that reading. So, most of the health and safety plans that I've been involved with, there's no action required for in the breathing zone until you get up around probably 15 or 20 parts per million, and then the action would be to check in more detail. It's not abandon the site or run away from the site or anything like that. So, the reading of 8.5 is, I would say, is probably within background. It would likely be within background noise of the instrument.

(Id. at 402a.)

DEP also took samples of the soil from the area where the pits were dug. (FOF ¶ 52.) While collecting the samples, DEP's inspector did some "minor probing with a spade shovel," and "some oil was liberated" and floated to the surface of water that had ponded in a test pit. (Hr'g Tr. at 297-99, R.R. at 300a.) The liberated oil caused a sheen to become apparent on the surface of the water. (Id.) The samples were tested and revealed the presence of petroleum compounds. (FOF ¶ 53.) DEP concluded that "[a]ll of the constituents were lower than the health based residential remediation standards established under [the Land

12

Recycling and Environmental Remediation Standards Act, commonly known as] Act 2."[7] (FOF ¶ 53.) DEP also interviewed four Amerikohl staff members. (R.R. 555a-60a.) Three staff members reported that no significant spill had occurred, but one staff member, Mr. Richter, "stated that near the end of the . . . job, vandals entered the site, removed a 2 [inch] pipe plug from the drain of the tank and opened the valve on the tank." (Id. at 557a.) Richter estimated that 20 gallons of oil may have spilled. (Id.) According to Richter, the act of vandalism was not reported to Petitioner or the State Police. (Id.)

At the close of evidence, Petitioner argued to the EHB that Stage 1 bond release was inappropriate for two reasons. First, with regard to the discovery of buried oil and solid waste on the Site, Petitioner argued that he met his burden to show facts necessary to compel a shifting of the burden to DEP and Amerikohl to show compliance with Section 315(b) of the Clean Streams Law, 35 P.S. § 691.315(b). (R.R. at 671a.) Because neither DEP nor Amerikohl presented evidence showing that no other waste was on the Site, Petitioner argued that the EHB should reverse DEP's decision. Second, with regard to the topography of the Site, Petitioner argued that the EHB should reverse DEP because the evidence showed that the Site was not returned to its AOC as required by Section 87.1 of DEP's regulations, 25 Pa. Code § 87.1. (R.R. at 674a.)

The EHB considered the evidence and the arguments made by the parties and issued its decision on March 23, 2016. The EHB applied Section 122(c)(2) of the EHB's Rules of Practice and Procedure[8] (EHB's Rules) and placed the burden

---

[7] Act of May 19, 1995, P.L. 4, 35 P.S. §§ 6026.101 – 6026.908.
[8] 25 Pa. Code § 1021.122(c)(2). Rule 122(c)(2) provides that: "A party appealing an action of the Department shall have the burden of proof . . . [w]hen a party who is not the recipient of an action by the Department protests the action." Id.

on Petitioner to prove that DEP abused its discretion in approving the Stage 1 bond release. (EHB Decision at 9.) The EHB reasoned that "in order to meet his burden of proof, [Petitioner] must demonstrate that his allegations of waste disposal and failure to meet [AOC] are supported by a preponderance of the evidence." (Id. at 10.)

The EHB then addressed Petitioner's arguments on AOC. The EHB found that Mr. Lightfoot's measurements were more credible than Mr. Rosner's since Mr. Lightfoot "used the methodology set forth in the mining regulations." (Id. at 14-15.) The EHB also found the photographs produced by DEP as highly probative. "The photographs show a gently sloped hillside that blends in with the area around it." (Id. at 16.) Based on Mr. Lightfoot's testimony and the photographs, the EHB concluded that Petitioner did not meet his burden of proof. (Id. at 16-17.)

Next, the EHB addressed Petitioner's contention that the Stage 1 bond release should not have been granted due to his allegations of dumped waste oil and solid waste. With regard to the oily rags, filters, and a lid from a bucket buried on the Site, the EHB concluded:

> We find that the presence of those materials, though disconcerting, is *de minimus* [sic] and does not constitute a basis for overturning [DEP's] approval of Stage 1 bond release. The presence of a handful of items in an area where equipment maintenance took place is not evidence of widespread disposal throughout the site. Moreover, the items have been removed from the site, albeit by [Petitioner], and there appears to be no further basis for withholding bond release on these grounds.

(Id. at 17.) With regard to the alleged oil dumping on the Site, the EHB found that "some amount of waste oil is present on the site," but found the amount to be

14

insignificant.  (Id. at 19.)  DEP performed sampling in the vicinity of the staging area and found constituents associated with waste oil in concentrations less than Act 2 standards, and no other testing repudiated these results.  (Id. at 19-20.) According to the EHB:

> Based on [Petitioner's] testimony and the results of [DEP's] sampling, we do not dispute [Petitioner's] allegation that some amount of waste oil is present on the site.  We have no doubt that waste oil was spilled in the staging area where equipment was kept and maintained.  The question is whether the amount of oil spilled is significant and/or widespread. The evidence indicates it is not. As noted earlier, sampling was performed only in one area of the site, in the vicinity of the staging area, and the sampling showed the presence of waste oil in insignificant amounts less than the Act 2 health based standards.

(Id. at 19.)  Petitioner argued that sampling should have been conducted in other areas of the Site, but the EHB reasoned that DEP and Amerikohl did not have the burden of proving that no other waste oil was on the Site because the most likely area for such a spill was the staging area, which was sampled and determined to contain petroleum in quantities less than Act 2 standards.  (Id.)  Thus, the EHB concluded "that the Department did not err in granting the Stage 1 bond release to Amerikohl."  (Id. at 20.)

Petitioner sought reconsideration from the EHB.  (R.R. at 866a-74a.) Therein, Petitioner raised, for the first time, an allegation that the EHB enabled DEP to avoid its obligations under Article I, Section 27 of the Pennsylvania Constitution, Pa. Const. art. 1, § 27, also known as the Environmental Rights Amendment (ERA).  The EHB denied reconsideration in an opinion that did not

address Petitioner's ERA argument. (R.R. at 921a-25a.) This appeal from the EHB's March 23, 2016 merits decision followed.[9]

## III. DISCUSSION

Petitioner raises four issues on appeal.[10] Petitioner first argues that the EHB erred by placing the burden of proof to show that there was no other waste on the Site upon Petitioner when it is Amerikohl that knows where any waste oil or solid waste may have been dumped or buried on the Site. Second, Petitioner argues that the EHB erred by determining that Petitioner did not meet his burden to show that the Stage 1 bond release was unacceptable under the Clean Streams Law in light of the oil and other waste uncovered on the Site. Third, Petitioner argues that DEP's conduct falls short of conduct required by the ERA. Finally, Petitioner contends that the EHB's conclusion that the Site was returned to its AOC is not supported by substantial evidence. We shall address each issue raised seriatim.

### A. Burden of Proof

Petitioner first argues that by requiring Petitioner to prove that there was widespread contamination of the Site, the EHB engrafted a standard for a Stage 1 bond release that is entirely new and not based on the law. Petitioner acknowledges that pursuant to the EHB's Rules, he bears the initial burden to show that the bond should not be released. He argues that he satisfied that burden by

---

[9] This Court's scope of review of an order of the EHB is whether the EHB "'committed an error of law or a constitutional violation, or whether any necessary findings of fact are not supported by substantial evidence.'" Brockway Borough Mun. Auth. v. Dep't of Envtl. Prot., 131 A.3d 578, 585 n.9 (Pa. Cmwlth. 2016) (quoting The Ainjar Trust v. Dep't of Envtl. Prot., 806 A.2d 482, 487 (Pa. Cmwlth. 2002)).

[10] We have adjusted the order of the issues raised to ease the discussion.

16

showing oil disposed of in the ground and the presence of solid waste. Petitioner contends that the EHB should have shifted the burden of production to Amerikohl to show that the evidence presented by Petitioner is the "total and complete evidence of contamination at the Site." (Petitioner's Br. at 19.) This approach makes sense in Petitioner's view because it is Amerikohl that possesses the most knowledge of the facts relevant to the inquiry. Petitioner also argues that public policy supports shifting the burden of proof to Amerikohl, as it will serve the purpose of the Clean Streams Law by deterring illegal dumping.

A person affected by DEP's decision to release a bond may file an appeal with the EHB, which will adjudicate the matter pursuant to the EHB's Rules. 25 Pa. Code § 86.171. According to EHB's Rules:

> the burden of proceeding and the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue. It shall generally be the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence. In cases where a party has the burden of proof to establish the party's case by a preponderance of the evidence, the Board may nonetheless require the other party to assume the burden of proceeding with the evidence in whole or in part if that party is in possession of facts or should have knowledge of facts relevant to the issue.

25 Pa. Code § 1021.122(a). The EHB's Rules state that the party appealing the action bears the burden of proof "[w]hen a party who is not the recipient of an action by [DEP] protests the action." 25 Pa. Code § 1021.122(c)(2). "After the protesting party produces evidence that [DEP's action] was erroneous, the *burden of production* shifts to DEP to justify [its action], but only after the protesting party presents evidence showing a likelihood of environmental harm. However, the ultimate *burden of proof* remains at all times with the protesting party."

17

Pennsylvania Trout v. Dep't of Envtl. Prot., 863 A.2d 93, 105 (Pa. Cmwlth. 2004) (citing Pa. Game Comm'n v. Dep't of Envtl. Prot., 509 A.2d 877, 884 (Pa. Cmwlth. 1986)) (emphasis added).

The EHB properly utilized its Rules to place the burden on Petitioner to prove that DEP erred when it concluded that Amerikohl was entitled to Stage 1 bond release in spite of the presence of small amounts of oil and other waste on the Site. After Petitioner provided information on the oil and waste left on the Site, EHB shifted the burden of production to DEP. DEP presented evidence of sampling and interviews with Amerikohl staff members. The EHB found this evidence probative and held that Petitioner did not sustain his burden of proof. The soil sample showed a small amount of waste oil, but the EHB found such evidence insufficient to prove that DEP erred by releasing the Stage 1 bond. Similarly, the EHB concluded that the presence of solid waste found buried at the Site, "though disconcerting," was "*de minimus*" [sic] and did "not constitute a basis for overturning the Department's approval of Stage 1 bond release." (EHB Decision at 17.)

It appears that the focus of Petitioner's appeal is less that the burden was improperly placed on Petitioner, but that the burden placed on Petitioner was too heavy, *i.e.* that EHB required a showing beyond that which is required by the Clean Streams Law. We shall now proceed to address that issue.

### B. Compliance with Clean Streams Law

Petitioner argues that by requiring a showing of "widespread contamination" to defeat a Stage 1 bond release, the EHB improperly engrafted a standard beyond what is required by the Clean Streams Law. Petitioner argues that Section 315(b)

of the Clean Streams Law requires "*all* temporary materials, property, debris or junk" be removed prior to the bond release of any stage. 35 P.S. § 691.315(b) (emphasis added). Petitioner contends that the evidence he produced showing the presence of both waste oil and unexpected trash is sufficient under the Clean Streams Law to preclude the Stage 1 bond release. Under Petitioner's understanding of the Clean Streams Law, the EHB should have required DEP to show that the waste oil and trash found by Petitioner were the only materials buried on the Site by Amerikohl.

DEP's regulations enacted pursuant to SMCRA list the factors relevant to the reclamation of the land that DEP must consider in making its bond release determination, 25 Pa. Code § 86.174, and Section 4(g) of SMCRA authorizes release of a bond if DEP "is satisfied the reclamation covered by the bond or portion thereof has been accomplished," 52 P.S. § 1396.4(g). In contrast to the discretion given to DEP under SMCRA and DEP's associated regulations regarding the reclamation *of the land*, Section 315(b) of the Clean Streams Laws sets a clear standard regarding the impact of the mining operation *on the waters* of the Commonwealth. Section 315(b) of the Clean Streams Law provides, in relevant part, that "[u]pon the completion of any mining operation and prior to the release by [DEP] of any portion of the bond liability, the operator *shall remove and clean up all* temporary materials, property, debris or junk which were used in or resulted from his mining operations." 35 P.S. § 691.315(b) (emphasis added).

Here, trash was left on the Site and waste oil entered the soil. With regard to the trash – the four filters, three oily rags, and plastic lid – discovered on the Site, these items were removed from the Site, albeit by Petitioner, and no other items were found. As such, Petitioner produced no evidence showing that Section

315(b) was not met with regard to the removal of solid waste from the Site, and so failed to meet his burden in this regard.

With regard to the waste oil left on the Site, the General Assembly enacted Act 2 in order to, *inter alia*, "set[] environmental remediation standards to provide a uniform framework for cleanup decisions because few environmental statutes set cleanup standards and to avoid potentially conflicting and confusing environmental standards." Section 2(4) of Act 2, 35 P.S. § 6026.102(4). To that end, the General Assembly declared:

> Cleanup plans should be based on the actual risk that contamination on the site may pose to public health and the environment, taking into account its current and future use and the degree to which contamination can spread offsite and expose the public or the environment to risk, not on cleanup policies requiring every site in this Commonwealth to be returned to a pristine condition.

35 P.S. § 6026.102(6). The standards established under Act 2 apply whenever site remediation is voluntarily conducted *or required* under various enactments, including the Clean Streams Law. Section 6(a) of Act 2, 35 P.S. § 6026.106(a) (emphasis added). We recognize that the Site is not an Act 2 site, and additional samples would be required if Amerikohl was seeking Act 2 liability protection, (Hr'g Tr. at 367, R.R. at 317a);[11] however, should DEP require Amerikohl to remediate the Site, DEP would require remediation to the contamination levels set by the regulations enforcing Act 2. As such, DEP did not abuse its discretion in using Act 2 remediation standards as a benchmark.

---

[11] Amerikohl has not taken the steps to seek liability protection under Act 2 as required by Section 250.2(c) of the Department's regulations. 25 Pa. Code § 250.2(c) ("To qualify for liability protection under the act, a person conducting remediation shall comply with this chapter and the act.").

DEP collected soil samples from the area most likely to contain waste oil. (EHB Decision at 19.) These samples showed petroleum compounds "lower than the health based residential remediation standards established under Act 2." (FOF ¶ 53.) Because Petitioner presented no evidence showing contamination above Act 2 levels or point to any other areas of the Site likely to contain waste oil, Petitioner did not meet his burden to show that the presence of waste oil precluded the Stage 1 bond release.

We do not agree with Petitioner that the EHB set a new and illegal standard for site remediation by stating that the materials found on the Site do not preclude the Stage 1 bond release because "the amount of oil spilled is [not] significant and/or widespread," and that the solid waste disposed on the site was "*de minimis*". (EHB Decision at 17, 19). While the EHB's phrasing may not be ideal, the EHB was responding directly to Petitioner's argument that Amerikohl or DEP must produce sampling of the *entire site* to prove compliance with Section 315(b) of the Clean Streams Law. (Id.) We understand the EHB's decision, not as setting a new standard, but as correctly concluding that neither Amerikohl nor DEP is required to conduct further testing based on Petitioner's evidentiary showing. The burden is on Petitioner, as the party challenging DEP's decision, to prove, by a preponderance of the evidence, that the bond should not be released. 25 Pa. Code § 1021.122(c)(2). Because the only debris or waste discovered was removed or fell below Act 2 health standards and Petitioner has not shown that other areas of the Site are likely to be contaminated, Petitioner failed to meet his burden.

21

## C. Compliance with the Environmental Rights Amendment

Petitioner next argues that DEP's conduct does not satisfy the obligations of the ERA as detailed in Payne v. Kassab, 312 A.2d 86, 94 (Pa. Cmwlth. 1973). The ERA provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27. This Court determines whether a cause of action under the ERA has been alleged, in part, by applying the threefold test established in Payne. The Payne test requires this Court to assess the following questions:

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

Payne, 312 A.2d at 94. Petitioner argues that the test is satisfied because: first, DEP's conduct violated the Clean Streams Law and other provisions of law; second, DEP undertook limited efforts to reduce the environmental incursion; and third, DEP's decision provided no environmental benefit so it cannot be said to outweigh the harm to the environment and Petitioner's property. Petitioner further contends, without extensive argument, that DEP's determination that the Site was

22

returned to AOC did not satisfy the ERA because it simply "eyeballed" the slopes, which is insufficient.

DEP argues in response that Petitioner waived this issue by not raising it below. We agree. Petitioner did not present any argument related to the ERA to the EHB prior to the EHB issuing its decision. While the issue was raised in Petitioner's Petition for Reconsideration (R.R. at 873a-74a), "issues raised for the first time in a reconsideration request, after the agency has issued its adjudication, cannot be regarded as raising the issues while the matter was before the agency." Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n, 926 A.2d 908, 924 (Pa. 2007). Unlike situations where the EHB is assessing a constitutional challenge to DEP's enabling legislation, which would not be waived on appeal, challenges to DEP's action under the ERA must be raised to the EHB in order to preserve the issue for appeal. See Lehman v. Pa. State Police, 839 A.2d 265, 276 (Pa. 2003) ("the waiver exception that exists for claims 'questioning the validity of a statute,' 2 Pa. C.S. § 703(a), applies only to facial challenges to a statute's constitutionality; such claims need not be raised before the administrative agency to be preserved for appellate review"). Accordingly, we will not consider Petitioner's argument that DEP's conduct violates the ERA.

### D. Approximate Original Contour

Finally, Petitioner argues that the EHB's conclusion that the Site was restored to its AOC was not supported by substantial evidence. Petitioner contends that his own unrebutted testimony and the testimony of Mr. Rosner show that the Site contained slopes steeper than those that existed before the mining operation began. Petitioner dismisses contrary testimony by Mr. Lightfoot of Earth Tech by

23

stating that Mr. Lightfoot did not survey the pre-mining condition of the Site nor survey the area examined by Mr. Rosner. Petitioner further dismisses the testimony of Mr. Shuss, DEP's Mine Conservation Inspector Supervisor, because Mr. Shuss admitted that he only "eyeballed" the Site to determine that AOC was met, which is insufficient under EHB case law.

Presented with conflicting evidence by two experts, the EHB exercised its discretion as fact-finder and relied on the testimony of Mr. Lightfoot showing that the Site was returned to its AOC. According to the EHB, "[a]lthough we were very impressed with Mr. Rosner and his credentials and experience, we assign a higher degree of reliability to Mr. Lightfoot's measurements since he used the methodology set forth in the mining regulations." (EHB Decision at 14-15.) The EHB also found probative photographs produced by DEP showing "a gently sloped hillside that blends in with the area around it." (Id. at 16.)

"It is axiomatic that questions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are properly within the exclusive discretion of the fact finding agency, and are not usually matters for a reviewing court." Birdsboro & Birdsboro Mun. Auth. v. Dep't of Envtl. Prot., 795 A.2d 444, 447 (Pa. Cmwlth. 2002) (quotation omitted). The EHB need not accept uncontested evidence, nor give any reason for finding one expert witness credible over another. Id. Regardless of the reason the EHB accepted Mr. Lightfoot's testimony and the photographs over any contrary evidence, we will not disturb the EHB's credibility determination and conclude that the EHB's finding that the Site was returned to its AOC is supported by substantial evidence.

24

## IV. CONCLUSION

Finding no error of law and that the EHB's finding that the Site was returned to AOC is supported by substantial evidence, the EHB's Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wayne K. Baker,                              :
                Petitioner     :
                             :
           v.                          :     No. 633 C.D. 2016
                             :
Department of Environmental        :
Protection,                                  :
               Respondent    :

## **O R D E R**

NOW, March 2, 2017, the Order of the Environmental Hearing Board in the above-captioned matter is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wayne K. Baker,  :
         Petitioner  :
           :
           :
         v.  :
           :
Department of Environmental  :
Protection,  :  No. 633 C.D. 2016
         Respondent  :  Argued: October 17, 2016


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE JOSEPH M. COSGROVE, Judge
             HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE COSGROVE           FILED: March 2, 2017


      The Environmental Hearing Board (EHB) acknowledged that "some amount of waste oil [was] present" on the site at issue in this matter, *Majority Opinion* at 14, and further stated that it "ha[d] no doubt that waste oil was spilled in the staging area where equipment was kept and maintained." *Id.* at 15. The EHB then noted the obvious: "The question is whether the amount of oil spilled is significant and/or widespread." *Id.* Instead of recognizing that the answer to this question was essential to a determination of whether a Stage I bond release was proper, the EHB stated that "sampling was performed only in one area of the site, in the vicinity of the staging area, and the sampling showed the presence of waste oil in insignificant amounts less than the Act 2[1] health based standards." *Id.*

---

[1] Act of May 19, 1995, P.L. 4, 35 P.S. §§ 6026.101-6026.908.

Rather than withhold the Stage I bond release and require further testing, the EHB reasoned that, given the levels of waste oil found and the area in which it was found, "the Department did not err in granting" the bond release. *Majority Opinion* at 15. Thus the EHB apparently assumed the amount of oil spilled was insignificant and not widespread, without a hint of proof to support this position other than pure speculation.

There is a certain illogic to this conclusion. Waste oil was present in the one sample taken, but the EHB reached a conclusion that the bond release, without further testing, was appropriate, since Petitioner did not show proof otherwise. This burden shifting is simply inconsistent with the Clean Streams Law[2], and despite the Majority's best efforts, it cannot fashion reasoning which sufficiently supports a contrary view. As such, I am compelled to dissent.


_____
JOSEPH M. COSGROVE, Judge

_____

[2] Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1-691.1001.

JMC - 2